[No. B037282. Second Dist., Div. Three. Jan. 26, 1989.]

BOARD OF SUPERVISORS OF LOS ANGELES COUNTY et al.,
Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
GLENN COMER et al., Real Parties in Interest.

**COUNSEL**

De Witt W. Clinton, County Counsel, Mary F. Wawro and Roberta M. Fesler, Assistant County Counsel, Steven J. Carnevale and Joe Ben Hudgens, Deputy County Counsel, for Petitioners.

No appearance for Respondent.

Richard A. Rothschild, Melinda R. Bird, Jim Carroll, Nancy Rimsha, David Pallack, Yvonne Mariajimenez, Fred Nakamura, Byron J. Gross,

Patricia L. Nagler, John Rittmayer and Jan C. Costello for Real Parties in Interest.

OPINION

KLEIN, P. J.—Petitioners, the Board of Supervisors of the County of Los Angeles (the Board, or the County) and Roberto Quiroz, Director of the Los Angeles County Department of Mental Health (the Director) (collectively, petitioners or the county defendants), seek a writ of mandate to prevent further enforcement of a preliminary injunction issued by respondent superior court, which injunction bars the Board from reducing its level of funding of mental health services.

Because Welfare and Institutions Code section 5709[1] limits county obligations in this regard, and for the additional reasons discussed, we direct the issuance of a peremptory writ.

FACTUAL AND PROCEDURAL BACKGROUND

On August 10, 1988, real parties in interest Glenn Comer, Peggy M. Ettlinger, Gladys Hayden, Frances Ronk, Della Alvarez and Robert Masserano (real parties) filed a class action complaint for declaratory and injunctive relief against the county defendants as well as the State of California and Jesse R. Huff, Director of Finance (collectively, the state defendants). In addition, real parties sought a temporary restraining order and an order to show cause re preliminary injunction.

1. *Real parties' complaint.*

Real parties plead they were indigent residents of Los Angeles County and sought to represent a class consisting of similarly situated persons who were receiving, or in the future would be eligible to receive, services provided by the County Department of Mental Health (the Department).

The essential allegations of real parties' complaint are summarized as follows: The County receives funding for mental health services pursuant to the Short-Doyle Act (hereinafter, Short-Doyle) (§ 5600 et seq.) and is required to contribute matching funds. State funding levels have not been maintained so as to reflect increased costs at the local level. Due to this shortfall in state funding, the County has provided more than its required matching funds, and the level of County funded mental health services has

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise specified.

been increased. Even the increased funding was inadequate to meet the needs of County indigents, and the unmet need for County mental health services exceeded $138 million, even prior to the subject reductions.

On July 14, 1988, the Board voted to adopt a budget for the Department which required a reduction in services of approximately $16.7 million over the 1988-1989 fiscal year. Beginning August 12, 1988, the reductions were to be implemented by closing or curtailing 13 clinics operated or funded by the County. The subject clinics provide medication and treatment to mentally ill patients who have no other source of care. Lacking necessary treatment, these patients would have psychotic and suicidal episodes requiring emergency hospitalization, thereby further burdening the already overcrowded County psychiatric facilities.

The first four causes of action of the complaint were directed against petitioners. Real parties complained of: (1) violation of Health and Safety Code (hereinafter H & S) section 1442.5, which requires detailed advance notice and a public hearing prior to reductions in services at county health facilities; (2) violation of H & S section 1442.5's requirement a county ensure the quality and availability of treatment provided to the indigent so that it is comparable to that available to the nonindigent at private facilities in the county; (3) violation of section 17000's requirement a county provide health services, including mental health services, to its indigent residents; and (4) violation of section 10000's requirement that services be provided promptly and humanely.

The fifth cause of action, directed against the state defendants, alleged violation of article XIIIB, section 6 of the California Constitution, which requires the state to reimburse local governments whenever the Legislature mandates a new program or a higher level of service on local government.

The sixth and final cause of action, against all of the defendants, requested a declaration as to the rights of the parties.

2. *Trial court action.*

On August 11, 1988, the trial court issued a temporary restraining order and an order to show cause re preliminary injunction.

The matter was heard August 29, 1988, and the preliminary injunction was granted. The trial court enjoined petitioners pending trial from: (1) implementing the mental health clinic closures or curtailments approved by the Board on July 14, 1988; (2) closing or curtailing other clinics, transferring or terminating staff, implementing a hiring freeze, cancelling patient appointments or failing to schedule appointments to implement the Board's budget restrictions; and (3) reducing the budget, personnel or services of

any other programs governed by section 17000 in order to comply with said preliminary injunction.

On September 22, 1988, petitioners filed the instant petition for writ of mandate and/or prohibition and/or other appropriate relief. We issued an alternative writ.[2]

## CONTENTIONS

Petitioners contend: (1) sections 5705 and 5709 set a county's maximum required contribution; (2) Short-Doyle comprehensively regulates the provision of government-funded mental health services; (3) general statutes establishing the duty to provide medical services to indigents have never been interpreted to apply to mental health services; (4) H & S sections 1442 and 1442.5 do not apply to reductions in a county's mental health program; and (5) by issuing the preliminary injunction, the trial court usurped the Board's legislative discretion.

## DISCUSSION

1. *Background.*

a. *County General Assistance.*

Section 17000 states: "Every county and every city and county shall relieve and support all *incompetent,* poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." (Italics added.)

County General Assistance in California dates from 1855, and for many years afforded the only form of relief to indigents. In 1931, the Legislature amended the Pauper Act of 1901, using language virtually identical to that of present section 17000. The provision was essentially continued with the 1937 enactment of the Welfare and Institutions Code. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 677-678 [94 Cal.Rptr. 279, 483 P.2d 1231].)

█ Section 17000 imposes upon counties a duty to provide hospital and medical services to indigent residents. (*County of San Diego* v. *Viloria* (1969) 276 Cal.App.2d 350, 352 [80 Cal.Rptr. 869]; *City of Lomita* v. *County of Los Angeles* (1983) 148 Cal.App.3d 671, 673 [196 Cal.Rptr. 221].)

*Madera Community Hospital* v. *County of Madera* (1984) 155 Cal.App.3d 136, 151 [201 Cal.Rptr. 768], examined the relationship of

---

[2]Although an order granting a preliminary injunction is appealable (Code Civ. Proc., § 904.1, subd. (f)), in view of the important public policy issues presented we issued an alternative writ to achieve an early resolution of this matter.

Medi-Cal to section 17000 and concluded Medi-Cal did not supplant a county's obligations under section 17000. The *Madera* court held: "[T]he Legislature intended that County bear an obligation to its poor and indigent residents, to be satisfied from county funds, notwithstanding federal or state programs which exist concurrently with County's obligation and alleviate, to a greater or lesser extent, County's burden." (*Ibid.,* original italics deleted.)

Thus, irrespective of the many specialized relief programs which are now in place, General Assistance remains "the residual fund by which indigents who cannot qualify for and under any specialized aid programs can still obtain the means of life." (*Mooney* v. *Pickett, supra,* 4 Cal.3d at pp. 680-681.)

b. *Short-Doyle.*

Short-Doyle (§ 5600 et seq.), as adopted in 1968, was "intended to organize and finance community mental health services for the mentally disordered in every county through locally administered and locally controlled community mental health programs[;] . . . *to integrate state-operated and community mental health programs into a unified mental health system; . . .* [and] *to establish a uniform ratio of local and state government responsibility for financing mental health services; . . .* [¶] The goals of the community mental health programs provided under this part are: [¶] (a) To assist persons who are institutionalized, or who have a high risk of becoming institutionalized, because of a mental disorder, to lead lives which are as normal and independent as possible, consistent with their individual capacities and desires. [¶] (b) To assist persons who experience temporary psychological problems, which disrupt normal living, to return as quickly as possible to a functioning level which enables them to cope with the problems of everyday life. [¶] (c) To prevent serious mental disorders and psychological problems." (§ 5600, italics added.)

Section 5700 et seq. sets forth the financial provisions of Short-Doyle.

Section 5705, subdivision (a), states in relevant part: "The net cost of all services specified in the approved county Short-Doyle plans shall be financed on a basis of 90 percent state funds and 10 percent county funds, except for local hospital inpatient costs, which shall be financed on a basis of 85 percent state funds and 15 percent county funds, irrespective of where or by whom the services are provided, except for services to be financed from other public or private sources as indicated in the county Short-Doyle plan."

Section 5709 provides: "Nothing in Sections 5705 to 5708, inclusive, shall prevent a county, or counties acting jointly, from appropriating additional funds for mental health services. *In no event shall counties be required to appropriate more than the amount required under the provisions of this chapter.*" (Italics added.)

2. *Short-Doyle limits county mental health obligations.*

    a. *Summary of arguments.*

Petitioners submit section 17000 does not apply to *mental health* services or, alternatively, that section 17000 mandates provision of mental health services only to the extent cost does not exceed the Short-Doyle limits.

Real parties concede no case has expressly held mental health services are covered by section 17000. They argue, however, relief and support of the mentally ill includes the provision of mental health care and, irrespective of the financing limits contained in Short-Doyle, those limits were not intended to limit a county's underlying duty under section 17000; it therefore follows petitioners are mandated by section 17000 to continue providing the services in issue.

■ For the reasons discussed below, we reject real parties' broad reading of section 17000 and hold section 5709 imposes an absolute limit on county mental health obligations.

    b. *Applicable statutory construction principles.*

■ Repeals by implication are not favored and are recognized only when there is a conflict between two or more legislative enactments. (*In re White* (1969) 1 Cal.3d 207, 212 [81 Cal.Rptr. 780, 460 P.2d 980].) They are recognized only when there is no rational basis for harmonizing the two potentially conflicting statutes and the statutes are " 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together.' " (*Ibid.*)

■ We must assume when passing a statute, the Legislature is aware of existing related laws and intends to maintain a consistent body of rules, and the rule giving precedence to the later statute is invoked only if the two cannot be harmonized. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].)

■ Even where a "new enactment does not specifically refer to [an earlier statute], and although repeals by implication are not favored [citation], when, . . . , a subsequently enacted specific statute directly conflicts

with an earlier, more general provision, it is settled that the subsequent legislation effects a limited repeal of the former statute to the extent that the two are irreconcilable. [Citations.]" (*Governing Board* v. *Mann* (1977) 18 Cal.3d 819, 828 [135 Cal.Rptr. 526, 558 P.2d 1].)

    c. *Application here.*

■■■ Preliminarily, *Madera Community Hospital* v. *County of Madera, supra,* 155 Cal.App.3d at page 136, relied on by real parties, is inapposite. As indicated, *Madera* addressed the relationship of Medi-Cal to section 17000, and held the Medi-Cal program did not supplant a county's medical care obligation under section 17000. (*Id.,* at pp. 150-151.) The instant case involves a *statutory* cap (§§ 5705, 5709) on a county's mental health obligation, which must be interpreted against the backdrop of section 17000.

By adopting Short-Doyle, the Legislature "integrate[d]" state-operated and community mental health programs into a comprehensive and "unified" mental health system. (§ 5600.) "Services to mentally disordered persons in the county or counties by county agencies and county institutions, by private agencies or facilities, and by the hospitals of the State Department of Mental Health [are] provided in accordance with the county Short-Doyle plan." (§ 5602.) Section 5705 lays down the state/county funding ratios, and section 5709 flatly fixes local responsibilities by providing: "In no event shall counties be required to appropriate more than the amount required under the provisions of this chapter."

Indeed, real parties' complaint acknowledges this fact by its allegation "the State [has] assumed responsibility for services to the mentally ill, requiring the county to contribute only a small proportion of the costs of these services."

Real parties argue, however, Short-Doyle did not repeal section 17000 in whole or in part. They submit Short-Doyle and section 17000 serve different purposes: Short-Doyle provides for state-funded mental health services generally and establishes ratios for state and county contributions; section 17000, on the other hand, is limited to the poor alone, and mandates a basic level of treatment for illness and disease.[3]

Real parties' attempt to harmonize sections 5709 and 17000 is unpersuasive. The only reasonable reading of these statutes is that section 5709 absolutely limits any duty imposed by section 17000. Were section 17000 construed to require counties fully to meet the need for mental health

---

[3]Neither petitioners nor real parties have found any legislative intent materials which speak to the relationship between Short-Doyle and the General Assistance statute, nor has our research disclosed any.

services without regard to the Short-Doyle limits, sections 5705 and 5709 essentially would be nullified, and county obligations in this area would be open-ended.

As set forth *ante,* real parties alleged even prior to the subject reductions the unmet need for mental health services in Los Angeles County *exceeded $138 million*.[4] Assuming arguendo real parties' reading of section 17000 is correct, not only would petitioners be precluded from implementing the subject $16.7 million reduction in services, but in addition, petitioners would be compelled to fill the large unmet need for mental health services which presently exists, without regard to other County needs.

Such an outcome would multiply the County's present mental health costs more than five-fold, and would enlarge its mental health obligations so greatly beyond the Short-Doyle limits as to make the two statutes " 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation.' " (*In re White, supra,* 1 Cal.3d at p. 212.) Accordingly, the specific language of section 5709 must be read as implicitly limiting any duty imposed by the earlier, general provision of section 17000. (*Governing Board* v. *Mann, supra,* 18 Cal.3d at p. 828.)

Because Short-Doyle limits a county's mental health obligations, section 17000 does not add anything to a county's duty in this regard, making the General Assistance statute inapplicable in this context.

d. *Real parties' proffered expansive reading of section 17000 would obviate the need for incremental legislation enacted in this area.*

Assuming arguendo section 17000's mandate to the counties to "relieve and support all incompetent, poor, indigent persons" requires the counties fully to provide mental health services as needed, there would have been no need for the step by step approach taken by the Legislature in the mental health field.

For example, section 5726, added in 1985, created "in the State Treasury the Target Supplement Fund . . . to support the development of resources and systems in solving the locally identified problems in serving the priority populations identified in Section 5651.1 . . . ."

The priority populations enumerated in section 5651.1 include: "(a) Chronically mentally ill, *including those who are homeless*." (§ 5651.1, italics added.)

---

[4]Appended as an exhibit to the petition is a declaration by the chief administrative officer for Los Angeles County, which avers: for the 1988-1989 fiscal year, the State has allocated $229 million as its share of the funding for the County's mental health programs; the County's required match is $29.5 million; the County has allocated almost $33 million, thereby exceeding its required share by nearly $3.5 million.

In 1985, the Legislature also established the Community Support System for *Homeless Mentally Disabled* "[i]n order to assist homeless mentally disabled persons to secure, stabilize, and maintain safe and adequate living arrangements in the community[.]" (§ 5680.)

In enacting said program, the Legislature expressed its "intent . . . that funds shall be made available to counties to assure the delivery of long-range services and community support assistance to *homeless mentally disabled persons* and . . . . [¶] . . . . [¶] [its] further . . . intent . . . that specific outreach and service priority be given under this chapter to *homeless mentally disabled persons not served by any local or state programs* . . . ." (§ 5681, italics added.)

Indisputably, the homeless are the ultimate indigent group. If counties already were required fully to provide mental health treatment services to the homeless by virtue of section 17000, there would have been no need for this subsequently enacted Short-Doyle legislation, rendering it an idle act. However, section 5681, by recognizing there were mentally disabled homeless who were not being served by any local programs, confirms that section 17000 does not mandate such services. ■ Although section 17000 remains the residual fund to sustain indigents who cannot qualify under any specialized aid programs (*Mooney* v. *Pickett, supra,* 4 Cal.3d at p. 681), section 5681 reflects that section 17000 is not a residual fund with respect to indigent mental health services.

e. *Legislature recognizes a county's limited duty under section 17000.*

In enacting the California Mental Health Services Reform Act of 1985 (Stats. 1985, ch. 1286, § 1.5, p. 4415), the Legislature pronounced its investigative findings and declared its purposes in adopting said act. Because the Legislature expressed its appreciation mental health services are vital, and recognized counties have limited resources, we quote the chapter at length: "(a) When deinstitutionalization policies were first adopted, the state and counties both assumed that the resources previously required to support the large state institutions would be shifted to the county level to support and treat those persons returned to or left in the community. In dramatic contrast to the community care system which developed for the developmentally disabled, in fact, this did not happen. As a result, large numbers of mentally disordered adults are homeless or living in seriously substandard conditions. Many others, in jails and prisons, receive little or no treatment, are discharged without proper provision for mental health treatment only to be reincarcerated at even greater human and public cost. [¶] (b) For those persons suffering from major mental disorders and their families, the absence of public policy for psychiatric and psychological help, treatment, and

psychosocial vocational support under deinstitutionalization has often had tragic and brutal consequences. The 'chronically mentally ill' need the same things in their lives most other people take for granted: shelter, food, clothing, friends, meaningful work, and a sense of self-worth. State mental health policy must demonstrate and reinforce the fact that the mentally disordered have personal value in this society and that they shall be provided access to the necessary social, medical, psychological, and vocational resources to make the most of their lives. [¶] (c) This absence of clear public policy has left the public mental health system in this state to manage the consequences. Many counties have performed admirably under the circumstances. . . . *But in too many other counties the volume of demand has far outweighed their ability to respond.* The system cries out for the focused attention of state and county government over the next several years." (Stats. 1985, ch. 1286, § 1.5, pp. 4415-4416.)

This legislative recognition of fiscal realities compels the conclusion section 17000 does not require counties to fund mental health services without regard to the limitations of sections 5705 and 5709.

In view of our analysis, we conclude the state shoulders the primary responsibility for the services in issue, the ratios of section 5705 and the maximum set by section 5709 constitute a legislative recognition of counties' limited resources, and section 17000 is not a barrier to petitioners' implementing the subject reductions in services.

3. *Remaining contentions.*

a. *H & S section 1442.5 inapplicable to mental health services.*

H & S section 1442.5 states before a county health care facility is closed or its level of services reduced, a board of supervisors must provide notice of public hearings to be held prior to a decision to proceed.

The statute further requires a board to make "findings based on evidence and testimony from these hearings that their proposed action will or will not have a detrimental impact on the health care needs of the indigents of the county. . . . [¶] Notwithstanding the board's closing of a county facility, the elimination of or reduction in the level of services provided, . . . , the county shall provide for the fulfillment of its duty to provide care *to all indigent people,* . . . [¶] . . . . [¶] (c) Whether this duty is fulfilled directly by the county or through alternative means, the availability of services, and the quality of the treatment received by people who cannot afford to pay for their health care *shall be the same* as that available to nonindigent people receiving health care services in private facilities in that county." (H & S § 1442.5, italics added.)

■ H & S section 1442.5, by its terms, cannot apply to county *mental health* services.

As discussed *ante,* section 5709 absolutely limits county mental health obligations. As a result, section 5709 irreconcilably conflicts with H & S section 1442.5's requirements that the counties fulfill their duty to provide medical care for *all* indigent people, and that such care be *comparable* to that enjoyed by the nonindigent.

We further note related H & S section 1442 requires a board, prior to reducing or eliminating health services or facilities, to submit a proposal to the State Department of Health Services. Short-Doyle, however, is administered by the State Department of Mental Health. (§ 5750.)[5]

   b. *Section 10000 likewise unavailing to real parties.*

■ Section 10000, which, like section 17000, is located within Division 9 of the Welfare and Institutions Code dealing with Public Social Services, expresses the Legislature's intent that aid and services to the needy and distressed be "provided promptly and *humanely, . . .*" (Italics added.)

Real parties' reliance on the above language is unavailing. First, Short-Doyle is found within a separate division of the Welfare and Institutions Code, namely, Division 5, which deals with Community Mental Health Services. Further, and in any event, the specific limiting language of sections 5705 and 5709 necessarily controls over the general statement of policy expressed in section 10000.

### CONCLUSION

This court appreciates mental health services in many instances can be as vital as other forms of health care. Unfortunately, there are insufficient funds available to meet all the perceived needs, requiring a prioritization of public expenditures.

Under real parties' analysis, section 17000, as the fund of last resort, requires counties to make up for the State's inadequate funding of mental health services. However, section 5709 absolutely limits counties' mental health obligations. Further, for the past decade counties have had little control over the amount of revenue available to operate their various programs. The legislative arena, rather than the courts, is the appropriate forum in which to raise these concerns.

---

[5] *Boehm* v. *County of Merced* (1985) 163 Cal.App.3d 447 [209 Cal.Rptr. 530], and *Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494 [223 Cal.Rptr. 716], pertaining to a county's duty under *section 17000* to make a factual determination of minimum *subsistence* needs of county indigents, are inapposite.

## DISPOSITION

The alternative writ of mandate having served its purpose is discharged. We order the issuance of a peremptory writ of mandate directing respondent superior court to vacate its order granting the preliminary injunction.

Petitioners to bear costs.

Danielson, J., and Croskey, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied May 17, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.