[No. S046843. Mar. 3, 1997.]

COUNTY OF SAN DIEGO, Cross-complainant and Respondent, v.
THE STATE OF CALIFORNIA et al., Cross-defendants and Appellants.

COUNSEL

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Richard T. Waldow, Deputy Attorneys General, for Cross-defendants and Appellants.

Lloyd M. Harmon, Jr., County Counsel, John J. Sansone, Acting County Counsel, Diane Bardsley, Chief Deputy County Counsel, Valerie Tehan and Ian Fan, Deputy County Counsel, for Cross-complainant and Respondent.

## OPINION

**CHIN, J.**—Section 6 of article XIII B of the California Constitution (section 6) requires the State of California (state), subject to certain exceptions, to "provide a subvention of funds to reimburse" local governments "[w]henever the Legislature or any state agency mandates a new program or higher level of service . . . ." In this action, the County of San Diego (San Diego or the County) seeks reimbursement under section 6 from the state for the costs of providing health care services to certain adults who formerly received medical care under the California Medical Assistance Program (Medi-Cal) (see Welf. & Inst. Code, § 14063)[1] because they were medically indigent, i.e., they had insufficient financial resources to pay for their own medical care. In 1979, when the electorate adopted section 6, the state provided Medi-Cal coverage to these medically indigent adults without requiring financial contributions from counties. Effective January 1, 1983, the Legislature excluded this population from Medi-Cal. (Stats. 1982, ch. 328, §§ 6, 8.3, 8.5, pp. 1574-1576; Stats. 1982, ch. 1594, §§ 19, 86, pp. 6315, 6357.) Since that date, San Diego has provided medical care to these individuals with varying levels of state financial assistance.

To resolve San Diego's claim, we must determine whether the Legislature's exclusion of medically indigent adults from Medi-Cal "mandate[d] a new program or higher level of service" on San Diego within the meaning of section 6. The Commission on State Mandates (Commission), which the Legislature created to determine claims under section 6, has ruled that section 6 does not apply to the Legislature's action and has rejected reimbursement claims like San Diego's. (See *Kinlaw* v. *State of California* (1991) 54 Cal.3d 326, 330, fn. 2 [285 Cal.Rptr. 66, 814 P.2d 1308] (*Kinlaw*).) The trial court and Court of Appeal in this case disagreed with the Commission, finding that San Diego was entitled to reimbursement. The state seeks

---

[1]Except as otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

reversal of this finding. It also argues that San Diego's failure to follow statutory procedures deprived the courts of jurisdiction to hear its claim. We reject the state's jurisdictional argument and affirm the finding that the Legislature's exclusion of medically indigent adults from Medi-Cal "mandate[d] a new program or higher level of service" within the meaning of section 6. Accordingly, we remand the matter to the Commission to determine the amount of reimbursement, if any, due San Diego under the governing statutes.

## I.  FUNDING OF INDIGENT MEDICAL CARE

Before the start of Medi-Cal, "the indigent in California were provided health care services through a variety of different programs and institutions." (Assem. Com. on Public Health, Preliminary Rep. on Medi-Cal (Feb. 29, 1968) p. 3 (Preliminary Report).) County hospitals "provided a wide range of inpatient and outpatient hospital services to all persons who met county indigency requirements whether or not they were public assistance recipients. The major responsibility for supporting county hospitals rested upon the counties, financed primarily through property taxes, with minor contributions from" other sources. (*Id.* at p. 4.)

Medi-Cal, which began operating March 1, 1966, established "a program of basic and extended health care services for recipients of public assistance and for medically indigent persons." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 738 [63 Cal.Rptr. 689, 433 P.2d 697] (*Morris*); *id.* at p. 740; see also Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, p. 103.) It "represent[ed] California's implementation of the federal Medicaid program (42 U.S.C. §§ 1396-1396v), through which the federal government provide[d] financial assistance to states so that they [might] furnish medical care to qualified indigent persons. [Citation.]" (*Robert F. Kennedy Medical Center* v. *Belshé* (1996) 13 Cal.4th 748, 751 [55 Cal.Rptr.2d 107, 919 P.2d 721] (*Belshé*).) "[B]y meeting the requirements of federal law," Medi-Cal "qualif[ied] California for the receipt of federal funds made available under title XIX of the Social Security Act." (*Morris, supra,* 67 Cal.2d at p. 738.) "Title [XIX] permitted the combination of the major governmental health care systems which provided care for the indigent into a single system financed by the state and federal governments. By 1975, this system, at least as originally proposed, would provide a wide range of health care services for all those who [were] indigent regardless of whether they [were] public assistance recipients . . . ." (Preliminary Rep., *supra,* at p. 4; see also Act of July 30, 1965, Pub.L. No. 89-97, § 121(a), 79 Stat. 286, reprinted in 1965 U.S. Code

Cong. & Admin. News, p. 378 [states must make effort to liberalize eligibility requirements "with a view toward furnishing by July 1, 1975, comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources"].)[2]

However, eligibility for Medi-Cal was initially limited only to persons linked to a federal categorical aid program by age (at least 65), blindness, disability, or membership in a family with dependent children within the meaning of the Aid to Families with Dependent Children program (AFDC). (See Legis. Analyst, Rep. to Joint Legis. Budget Com., Analysis of 1971-1972 Budget Bill, Sen. Bill No. 207 (1971 Reg. Sess.) pp. 548, 550 (1971 Legislative Analyst's Report).) Individuals possessing one of these characteristics (categorically linked persons) received full benefits if they actually received public assistance payments. (*Id.* at p. 550.) Lesser benefits were available to categorically linked persons who were only medically indigent, i.e., their income and resources, although rendering them ineligible for cash aid, were "not sufficient to meet the cost of health care." (*Morris, supra,* 67 Cal.2d at p. 750; see also 1971 Legis. Analyst's Rep., *supra,* at pp. 548, 550; Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, pp. 105-106.)

Individuals not linked to a federal categorical aid program (non-categorically linked persons) were ineligible for Medi-Cal, regardless of their means. Thus, "a group of citizens, not covered by Medi-Cal and yet unable to afford medical care, remained the responsibility of" the counties. (*County of Santa Clara v. Hall* (1972) 23 Cal.App.3d 1059, 1061 [100 Cal.Rptr. 629] (*Hall*).) In establishing Medi-Cal, the Legislature expressly recognized this fact by enacting former section 14108.5, which provided: "The Legislature hereby declares its concern with the problems which will be facing the counties with respect to the medical care of indigent persons who are not covered [by Medi-Cal] . . . and . . . whose medical care must be financed entirely by the counties in a time of heavily increasing medical costs." (Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, p. 116.) The Legislature directed the Health Review and Program Council "to study this problem and report its findings to the Legislature no later than March 1, 1967." (*Ibid.*)

Moreover, although it required counties to contribute to the costs of Medi-Cal, the Legislature established a method for determining the amount of their contributions that would "leave them with []sufficient funds to provide hospital care for those persons not eligible for Medi-Cal." (*Hall, supra,* 23 Cal.App.3d at p. 1061, fn. omitted.) Former section 14150.1,

---

[2]Congress later repealed the requirement that states work towards expanding eligibility. (See Cal. Health and Welfare Agency, The Medi-Cal Program: A Brief Summary of Major Events (Mar. 1990) p. 1 (Summary of Major Events).)

which was known as the "county option" or the "option plan," required a county "to pay the state a sum equal to 100 percent of the county's health care costs (which included both linked and nonlinked individuals) provided in the 1964-1965 fiscal year, with an adjustment for population increase; in return the state would pay the county's entire cost of medical care."[3] (*County of Sacramento* v. *Lackner* (1979) 97 Cal.App.3d 576, 581 [159 Cal.Rptr. 1] (*Lackner*).) Under the county option, "the state agreed to assume all county health care costs . . . in excess of" the county's payment. (*Id.* at p. 586.) It "made no distinction between 'linked' and 'nonlinked' persons," and "simply guaranteed a medical cost ceiling to counties electing to come within the option plan." (*Ibid.*) "Any difference in actual operating costs and the limit set by the option provision [was] assumed entirely by the state." (Preliminary Rep., *supra*, at p. 10, fn. 2.) Thus, the county option "guarantee[d] state participation in the cost of care for medically indigent persons who [were] not otherwise covered by the basic Medi-Cal program or other repayment programs."[4] (1971 Legis. Analyst's Rep., *supra*, at p. 549.)

Primarily through the county option, Medi-Cal caused a "significant shift in financing of health care from the counties to the state and federal government. . . . During the first 28 months of the program the state . . . paid approximately $76 million for care of non-Medi-Cal indigents in county hospitals." (Preliminary Rep., *supra*, at p. 31.) These state funds paid "costs that would otherwise have been borne by counties through increases in property taxes." (Legis. Analyst, Rep. to Joint Legis. Budget Com., Analysis of 1974-1975 Budget Bill, Sen. Bill No. 1525 (1973-1974 Reg. Sess.) p. 626 (1974 Legislative Analyst's Report).) "[F]aced with escalating Medi-Cal costs, the Legislature in 1967 imposed strict guidelines on reimbursing counties electing to come under the 'option' plan. ([Former] § 14150.2.) Pursuant to subdivision (c) of [former] section 14150.2, the state imposed a limit on its obligation to pay for medical services to nonlinked persons

---

[3]Former section 14150.1 provided in relevant part: "[A] county may elect to pay as its share [of Medi-Cal costs] one hundred percent . . . of the county cost of health care uncompensated from any source in 1964-65 for all categorical aid recipients, and all other persons in the county hospital or in a contract hospital, increased for such county for each fiscal year subsequent to 1964-65 by an amount proportionate to the increase in population for such county . . . . If the county so elects, the county costs of health care in any fiscal year shall not exceed the total county costs of health care uncompensated from any source in 1964-65 for all categorical aid recipients, and all other persons in the county hospital or in a contract hospital, increased for such county for each fiscal year subsequent to 1964-65 by an amount proportionate to the increase in population for such county . . . ." (Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, p. 121.)

[4]Former section 14150 provided the standard method for determining the counties' share of Medi-Cal costs. Under it, "a county was required to pay the state a specific sum, in return for which the state would pay for the medical care of all [categorically linked] individuals . . . . Financial responsibility for nonlinked individuals . . . remained with the counties." (*Lackner*, *supra*, 97 Cal.App.3d at p. 581.)

served by a county within the 'option' plan." (*Lackner, supra,* 97 Cal.App.3d at p. 589; see also Stats. 1967, ch. 104, § 3, p. 1019; Stats. 1969, ch. 21, § 57, pp. 106-107; 1974 Legis. Analyst's Rep., *supra,* at p. 626.)

In 1971, the Legislature substantially revised Medi-Cal. It extended coverage to certain noncategorically linked minors and adults "who [were] financially unable to pay for their medical care." (Legis. Counsel's Dig., Assem. Bill No. 949, 3 Stats. 1971 (Reg. Sess.) Summary Dig., p. 83; see Stats. 1971, ch. 577, §§ 12, 23, pp. 1110-1111, 1115.) These medically indigent individuals met "the income and resource requirements for aid under [AFDC] but [did] not otherwise qualify[] as a public assistance recipient." (56 Ops.Cal.Atty.Gen. 568, 569 (1973).) The Legislature anticipated that this eligibility expansion would bring "approximately 800,000 additional medically needy Californians" into Medi-Cal. (Stats. 1971, ch. 577, § 56, p. 1136.) The 1971 legislation referred to these individuals as " '[n]oncategorically related needy person[s].' " (Stats. 1971, ch. 577, § 23, p. 1115.) Subsequent legislation designated them as "medically indigent person[s]" (MIP's) and provided them coverage under former section 14005.4. (Stats. 1976, ch. 126, § 7, p. 200; *id.* at § 20, p. 204.)

The 1971 legislation also established a new method for determining each county's financial contribution to Medi-Cal. The Legislature eliminated the county option by repealing former section 14150.1 and enacting former section 14150. That section specified (by amount) each county's share of Medi-Cal costs for the 1972-1973 fiscal year and set forth a formula for increasing the share in subsequent years based on the taxable assessed value of certain property. (Stats. 1971, ch. 577, §§ 41, 42, pp. 1131-1133.)

For the 1978-1979 fiscal year, the state assumed each county's share of Medi-Cal costs under former section 14150. (Stats. 1978, ch. 292, § 33, p. 610.) In July 1979, the Legislature repealed former section 14150 altogether, thereby eliminating the counties' responsibility to share in Medi-Cal costs. (Stats. 1979, ch. 282, § 74, p. 1043.) Thus, in November 1979, when the electorate adopted section 6, "the state was funding Medi-Cal coverage for [MIP's] without requiring any county financial contribution." (*Kinlaw, supra,* 54 Cal.3d at p. 329.) The state continued to provide full funding for MIP medical care through 1982.

In 1982, the Legislature passed two Medi-Cal reform bills that, as of January 1, 1983, excluded from Medi-Cal most adults who had been eligible

under the MIP category (adult MIP's or Medically Indigent Adults).[5] (Stats. 1982, ch. 328, §§ 6, 8.3, 8.5, pp. 1574-1576; Stats. 1982, ch. 1594, §§ 19, 86, pp. 6315, 6357; *Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401, 411 [261 Cal.Rptr. 706] *(Cooke).*) As part of excluding this population from Medi-Cal, the Legislature created the Medically Indigent Services Account (MISA) as a mechanism for "transfer[ing] [state] funds to the counties for the provision of health care services." (Stats. 1982, ch. 1594, § 86, p. 6357.) Through MISA, the state annually allocated funds to counties based on "the average amount expended" during the previous three fiscal years on Medi-Cal services for county residents who had been eligible as MIP's. (Stats. 1982, ch. 1594, § 69, p. 6345.) The Legislature directed that MISA funds "be consolidated with existing county health services funds in order to provide health services to low-income persons and other persons not eligible for the Medi-Cal program." (Stats. 1982, ch. 1594, § 86, p. 6357.) It further provided: "Any person whose income and resources meet the income and resource criteria for certification for [Medi-Cal] services pursuant to Section 14005.7 other than for the aged, blind, or disabled, shall not be excluded from eligibility for services to the extent that state funds are provided." (Stats. 1982, ch. 1594, § 70, p. 6346.)

After passage of the 1982 legislation, San Diego established a county medical services (CMS) program to provide medical care to adult MIP's. According to San Diego, between 1983 and June 1989, the state fully funded San Diego's CMS program through MISA. However, for fiscal years 1989-1990 and 1990-1991, the state only partially funded San Diego's CMS program. For example, San Diego asserts that, in fiscal year 1990-1991, it exhausted state-provided MISA funds by December 24, 1990. Faced with this shortfall, San Diego's board of supervisors voted in February 1991 to terminate the CMS program unless the state agreed by March 8 to provide full funding for the 1990-1991 fiscal year. After the state refused to provide additional funding, San Diego notified affected individuals and medical service providers that it would terminate the CMS program at midnight on March 19, 1991. The response to the County's notification ultimately resulted in the unfunded mandate claim now before us.

## II.  UNFUNDED MANDATES

Through adoption of Proposition 13 in 1978, the voters added article XIII A to the California Constitution, which "imposes a limit on the power of state and local governments to adopt and levy taxes. [Citation.]" *(County of Fresno* v. *State of California* (1991) 53 Cal.3d 482, 486 [280 Cal.Rptr. 92,

---

[5]In this opinion, the terms "adult MIP's" and "Medically Indigent Adults" refer only to those persons who were excluded from the Medi-Cal program by the 1982 legislation.

808 P.2d 235] (*County of Fresno*).) The next year, the voters added article XIII B to the Constitution, which "impose[s] a complementary limit on the rate of growth in governmental spending." (*San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 574 [7 Cal.Rptr.2d 245, 828 P.2d 147].) ▉ These two constitutional articles "work in tandem, together restricting California governments' power both to levy and to spend for public purposes." (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 59, fn. 1 [266 Cal.Rptr. 139, 785 P.2d 522].) Their goals are "to protect residents from excessive taxation and government spending. [Citation.]" (*County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 61 [233 Cal.Rptr. 38, 729 P.2d 202] (*County of Los Angeles*).)

Article XIII B of the California Constitution includes section 6, which is the constitutional provision at issue here. It provides in relevant part: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] . . . [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975." Section 6 recognizes that articles XIII A and XIII B severely restrict the taxing and spending powers of local governments. (*County of Fresno, supra*, 53 Cal.3d at p. 487.) Its purpose is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are "ill equipped" to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose. (*County of Fresno, supra*, 53 Cal.3d at p. 487; *County of Los Angeles, supra*, 43 Cal.3d at p. 61.) With certain exceptions, section 6 "[e]ssentially" requires the state "to pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies. [Citation.]" (*Hayes* v. *Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577 [15 Cal.Rptr.2d 547].)

In 1984, the Legislature created a statutory procedure for determining whether a statute imposes state-mandated costs on a local agency within the meaning of section 6. (Gov. Code, § 17500 et seq.). The local agency must file a test claim with the Commission, which, after a public hearing, decides whether the statute mandates a new program or increased level of service. (Gov. Code, §§ 17521, 17551, 17555.) If the Commission finds a claim to be reimbursable, it must determine the amount of reimbursement. (Gov. Code, § 17557.) The local agency must then follow certain statutory procedures to

obtain reimbursement. (Gov. Code, § 17558 et seq.) If the Legislature refuses to appropriate money for a reimbursable mandate, the local agency may file "an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement." (Gov. Code, § 17612, subd. (c).) If the Commission finds no reimbursable mandate, the local agency may challenge this finding by administrative mandate proceedings under section 1094.5 of the Code of Civil Procedure. (Gov. Code, § 17559.) Government Code section 17552 declares that these provisions "provide the sole and exclusive procedure by which a local agency . . . may claim reimbursement for costs mandated by the state as required by Section 6 . . . ."

### III.  ADMINISTRATIVE AND JUDICIAL PROCEEDINGS

### A.  *The Los Angeles Action*

On November 23, 1987, the County of Los Angeles (Los Angeles) filed a claim (the Los Angeles action) with the Commission asserting that the exclusion of adult MIP's from Medi-Cal constituted a reimbursable mandate under section 6. (*Kinlaw, supra,* 54 Cal.3d at p. 330, fn. 2.) Alameda County subsequently filed a claim on November 30, 1987, but the Commission rejected it because of the pending Los Angeles claim. (*Id.* at p. 331, fn. 4.) Los Angeles refused to permit Alameda County to join as a claimant, but permitted San Bernardino County to join. (*Ibid.*)

In April 1989, the Commission rejected the Los Angeles claim, finding no reimbursable mandate.[6] (*Kinlaw, supra,* 54 Cal.3d at p. 330, fn. 2.) It found that the 1982 legislation did not impose on counties a new program or a higher level of service for an existing program because counties had a "pre-existing duty" to provide medical care to the medically indigent under section 17000. That section provides in relevant part: "Every county . . . shall relieve and support all incompetent, poor, indigent persons . . . lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." Section 17000 did not impose a reimbursable mandate under section 6, the Commission further reasoned, because it "was enacted prior to January 1, 1975 . . . ." Finally, the Commission found no mandate because the 1982 legislation "neither establish[ed] the level of care to be provided nor . . . define[d] the class of persons determined to be eligible for medical care since these criteria were established by boards of supervisors" pursuant to section 17001.

On March 20, 1990, the Los Angeles Superior Court filed a judgment reversing the Commission's decision and directing issuance of a peremptory

---

[6]San Diego lodged with the trial court a copy of the Commission's decision in the Los Angeles action.

writ of mandate. On April 16, 1990, the Commission and the state filed an appeal in the Second District Court of Appeal. (*County of Los Angeles* v. *State of California*, No. B049625.)[7] In early 1992, the parties to the Los Angeles action agreed to settle their dispute and to seek dismissal. In April 1992, after learning of this agreement, San Diego sought to intervene. Explaining that it had been waiting for resolution of the action, San Diego requested that the Court of Appeal deny the dismissal request and add (or substitute in) the County as a party. The Court of Appeal did not respond. On December 15, 1992, the parties to the Los Angeles action entered into a settlement agreement that provided for vacation of the superior court judgment and dismissal of the appeal and superior court action. Consistent with the settlement agreement, on December 29, 1992, the Court of Appeal filed an order vacating the superior court judgment, dismissing the appeal, and instructing the superior court to dismiss the action without prejudice on remand.[8]

### B. The San Diego Action

#### 1. Administrative Attempts to Obtain Reimbursement

On March 13, 1991, San Diego submitted an invoice to the State Controller seeking reimbursement of its uncompensated expenditures on the CMS program for fiscal year 1989-1990. The Controller is a member of the Commission. (Gov. Code, § 17525.) On April 12, the Controller returned the invoice "without action," stating that "[n]o appropriation has been given to this office to allow for reimbursement" of medical costs for adult MIP's, and noting that litigation was pending regarding the state's reimbursement obligation. On December 18, 1991, San Diego submitted a similar invoice for the 1990-1991 fiscal year. The state has not acted regarding this second invoice.

---

[7]In setting forth the facts relating to the Los Angeles action, we rely in part on the appellate record from that action, of which we take judicial notice. (Evid. Code, §§ 452, subd. (d), 459.)

[8]The settlement resulted from 1991 legislation that changed the system of health care funding as of June 30, 1991. (See § 17600 et seq.; Stats. 1991, chs. 87, 89, pp. 231-235, 243-341.) That legislation provided counties with new revenue sources, including a portion of state vehicle license fees, to fund health care programs. However, the legislation declared that the statutes providing counties with vehicle license fees would "cease to be operative on the first day of the month following the month in which the Department of Motor Vehicles is notified by the Department of Finance of a final judicial determination by the California Supreme Court or any California court of appeal" that "[t]he state is obligated to reimburse counties for costs of providing medical services to medically indigent adults pursuant to Chapters 328 and 1594 of the Statutes of 1982." (Rev. & Tax. Code, §§ 10753.8, subd. (b)(2), 11001.5, subd. (d)(2); see also Stats. 1991, ch. 89, § 210, p. 340.) Los Angeles and San Bernardino Counties settled their action to avoid triggering these provisions. Unlike the dissent, we do not believe that consideration of these recently enacted provisions is appropriate in analyzing the 1982 legislation. Nor do we assume, as the dissent does, that our decision necessarily triggers these provisions. That issue is not before us.

## 2. Court Proceedings

Responding to San Diego's notice of intent to terminate the CMS program, on March 11, 1991, the Legal Aid Society of San Diego filed a class action on behalf of CMS program beneficiaries seeking to enjoin termination of the program. The trial court later issued a preliminary injunction prohibiting San Diego "from taking any action to reduce or terminate" the CMS program.

On March 15, 1991, San Diego filed a cross-complaint and petition for writ of mandate under Code of Civil Procedure section 1085 against the state, the Commission, and various state officers.[9] The cross-complaint alleged that, by excluding adult MIP's from Medi-Cal and transferring responsibility for their medical care to counties, the state had mandated a new program and higher level of service within the meaning of section 6. The cross-complaint further alleged that the state therefore had a duty under section 6 to reimburse San Diego for the entire cost of its CMS program, and that the state had failed to perform its duty.

Proceeding from these initial allegations, the cross-complaint alleged causes of action for indemnification, declaratory and injunctive relief, reimbursement and damages, and writ of mandate. In its first declaratory relief claim, San Diego alleged (on information and belief) that the state contended the CMS program was a nonreimbursable, county obligation. In its claim for reimbursement, San Diego alleged (again on information and belief) that the Commission had "previously denied the claims of other counties, ruling that county medical care programs for [adult MIP's] are not state-mandated and, therefore, counties are not entitled to reimbursement from the State for the costs of such programs." "Under these circumstances," San Diego asserted, "denial of the County's claim by the Commission . . . is virtually certain and further administrative pursuit of this claim would be a futile act."

For relief, San Diego requested a judgment declaring the following: (1) that the state must fully reimburse San Diego if it "is compelled to provide any CMS Program services to plaintiffs . . . after March 19, 1991"; (2) that section 6 requires the state "to fully fund the CMS Program" (or, alternatively, that the CMS program is discretionary); (3) that the state must pay San Diego for all of its unreimbursed costs for the CMS program during

---

[9]The cross-complaint named the following state officers: (1) Kenneth W. Kizer, Director of the Department of Health Services; (2) Kim Belshé, Acting Secretary of the Health and Welfare Agency; (3) Gray Davis, the State Controller; (4) Kathleen Brown, the State Treasurer; and (5) Thomas Hayes, the Director of the Department of Finance. Where the context suggests, subsequent references in this opinion to "the state" include these officers.

the 1989-1990 and 1990-1991 fiscal years; and (4) that the state shall assume responsibility for operating any court-ordered continuation of the CMS program. San Diego also requested that the court issue a writ of mandamus requiring the state to fulfill its reimbursement obligation. Finally, San Diego requested issuance of preliminary and permanent injunctions to ensure that the state fulfilled its obligations to the County.

In April 1991, San Diego determined that it could continue operating the CMS program using previously unavailable general fund revenues. Accordingly, San Diego and plaintiffs settled their dispute, and plaintiffs dismissed their complaint.

The matter proceeded solely on San Diego's cross-complaint. The court issued a preliminary injunction and alternative writ in May 1991. At a hearing on June 25, 1991, the court found that the state had an obligation to fund San Diego's CMS program, granted San Diego's request for a writ of mandate, and scheduled an evidentiary hearing to determine damages and remedies. On July 1, 1991, it issued an order reflecting this ruling and granting a peremptory writ of mandate. The writ did not issue, however, because of the pending hearing to determine damages. In December 1992, after an extensive evidentiary hearing and posthearing proceedings on the claim for a peremptory writ of mandate, the court issued a judgment confirming its jurisdiction to determine San Diego's claim, finding that section 6 required the state to fund the entire cost of San Diego's CMS program, determining the amount that the state owed San Diego for fiscal years 1989-1990 and 1990-1991, identifying funds available to the state to satisfy the judgment, and ordering issuance of a peremptory writ of mandate.[10] The court also issued a peremptory writ of mandate directing the state and various state officers to comply with the judgment.

The Court of Appeal affirmed the judgment insofar as it provided that section 6 requires the state to fund the CMS program. The Court of Appeal also affirmed the trial court's finding that the state had required San Diego to spend at least $41 million on the CMS program in fiscal years 1989-1990 and 1990-1991. However, the Court of Appeal reversed those portions of the judgment determining the final reimbursement amount and specifying the state funds from which the state was to satisfy the judgment. It remanded the matter to the Commission to determine the reimbursement amount and appropriate statutory remedies. We then granted the state's petition for review.

## IV. SUPERIOR COURT JURISDICTION

Before reaching the merits of the appeal, we must address the state's assertion that the superior court lacked jurisdiction to hear San

---

[10]The judgment dismissed all of San Diego's other claims.

Diego's mandate claim. According to the state, in *Kinlaw, supra,* 54 Cal.3d 326, we "unequivocally held that the orderly determination of [unfunded] mandate questions demands that only one claim on any particular alleged mandate be entertained by the courts at any given time." Thus, if a test claim is pending, "other potential claims must be held in abeyance . . . ." Applying this principle, the state asserts that, since "the test claim litigation was pending" in the Los Angeles action when San Diego filed its cross-complaint seeking mandamus relief, "the superior court lacked jurisdiction from the outset, and the resulting judgment is a nullity. That defect cannot be cured by the settlement of the test claim, which occurred after judgment was entered herein."

In *Kinlaw,* we held that individual taxpayers and recipients of government benefits lack standing to enforce section 6 because the applicable administrative procedures, which "are the exclusive means" for determining and enforcing the state's section 6 obligations, "are available only to local agencies and school districts directly affected by a state mandate . . . ." (*Kinlaw, supra,* 54 Cal.3d at p. 328.) In reaching this conclusion, we explained that the reimbursement right under section 6 "is a right given by the Constitution to local agencies, not individuals either as taxpayers or recipients of government benefits and services." (*Id.* at p. 334.) We concluded that "[n]either public policy nor practical necessity compels creation of a judicial remedy by which individuals may enforce the right of the county to such revenues." (*Id.* at p. 335.)

In finding that individuals do not have standing to enforce the section 6 rights of local agencies, we made several observations in *Kinlaw* pertinent to operation of the statutory process as it applies to entities that do have standing. Citing Government Code section 17500, we explained that "the Legislature enacted comprehensive administrative procedures for resolution of claims arising out of section 6 . . . because the absence of a uniform procedure had resulted in inconsistent rulings on the existence of state mandates, unnecessary litigation, reimbursement delays, and, apparently, resultant uncertainties in accommodating reimbursement requirements in the budgetary process." (*Kinlaw, supra,* 54 Cal.3d at p. 331.) Thus, the governing statutes "establish[] procedures which exist for the express purpose of avoiding multiple proceedings, judicial and administrative, addressing the same claim that a reimbursable state mandate has been created." (*Id.* at p. 333.) Specifically, "[t]he legislation establishes a test-claim procedure to expeditiously resolve disputes affecting multiple agencies . . . ." (*Id.* at p. 331.) Describing the Commission's application of the test-claim procedure to claims regarding exclusion of adult MIP's from Medi-Cal, we observed: "The test claim by the County of Los Angeles was filed prior to that

proposed by Alameda County. The Alameda County claim was rejected for that reason. (See [Gov. Code,] § 17521.) Los Angeles County permitted San Bernardino County to join in its claim which the Commission accepted as a test claim intended to resolve the [adult MIP exclusion] issues . . . . Los Angeles County declined a request from Alameda County that it be included in the test claim . . . ." (*Id.* at p. 331, fn. 4.)

Consistent with our observations in *Kinlaw*, we here agree with the state that the trial court should not have proceeded to resolve San Diego's claim for reimbursement under section 6 while the Los Angeles action was pending. A contrary conclusion would undermine one of "the express purpose[s]" of the statutory procedure: to "avoid[] multiple proceedings . . . addressing the same claim that a reimbursable state mandate has been created." (*Kinlaw*, *supra*, 54 Cal.3d at p. 333.)

██ However, we reject the state's assertion that the error was jurisdictional. The power of superior courts to perform mandamus review of administrative decisions derives in part from article VI, section 10 of the California Constitution. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 138 [93 Cal.Rptr. 234, 481 P.2d 242]; *Lipari* v. *Department of Motor Vehicles* (1993) 16 Cal.App.4th 667, 672 [20 Cal.Rptr.2d 246].) That section gives "[t]he Supreme Court, courts of appeal, [and] superior courts . . . original jurisdiction in proceedings for extraordinary relief in the nature of mandamus . . . ." (Cal. Const., art. VI, § 10.) "The jurisdiction thus vested may not lightly be deemed to have been destroyed." (*Garrison* v. *Rourke* (1948) 32 Cal.2d 430, 435 [196 P.2d 884], overruled on another ground in *Keane* v. *Smith* (1971) 4 Cal.3d 932, 939 [95 Cal.Rptr. 197, 485 P.2d 261].) "While the courts are subject to reasonable statutory regulation of procedure and other matters, they will maintain their constitutional powers in order effectively to function as a separate department of government. [Citations.] Consequently an intent to defeat the exercise of the court's jurisdiction will not be supplied by implication." (*Garrison*, *supra*, at p. 436.) ██ Here, we find no statutory provision that either "expressly provide[s]" (*id.* at p. 435) or otherwise "clearly indicate[s]" (*id.* at p. 436) that the Legislature intended to divest all courts other than the court hearing the test claim of their mandamus jurisdiction.

Rather, following *Dowdall* v. *Superior Court* (1920) 183 Cal. 348 [191 P. 685] (*Dowdall*), we interpret the governing statutes as simply vesting primary jurisdiction in the court hearing the test claim. In *Dowdall*, we determined the jurisdictional effect of Code of Civil Procedure former section 1699 on actions to settle the account of trustees of a testamentary trust. Code of Civil Procedure former section 1699 provided in part: "Where any trust

has been created by or under any will to continue after distribution, the Superior Court shall not lose jurisdiction of the estate by final distribution, but shall retain jurisdiction thereof for the purpose of the settlement of accounts under the trust." (Stats. 1889, ch. 228, § 1, p. 337.) We explained that, under this section, "the superior court, sitting in probate upon the distribution of an estate wherein the will creates a trust, retain[ed] jurisdiction of the estate for the purpose of the settlement of the accounts under the trust." (*Dowdall, supra*, 183 Cal. at p. 353.) However, we further observed that "the superior court of each county in the state has general jurisdiction in equity to settle trustees' accounts and to entertain actions for injunctions. This jurisdiction is, in a sense, concurrent with that of the superior court, which, by virtue of the decree of distribution, has jurisdiction of a trust created by will. The latter, however, is the primary jurisdiction, and if a bill in equity is filed in any other superior court for the purpose of settling the account of such trustee, that court, upon being informed of the jurisdiction of the court in probate and that an account is to be or has been filed therein for settlement, should postpone the proceeding in its own case and allow the account to be settled by the court having primary jurisdiction thereof." (*Ibid.*)

Similarly, we conclude that, under the statutes governing determination of unfunded mandate claims, the court hearing the test claim has primary jurisdiction. Thus, if an action asserting the same unfunded mandate claim is filed in any other superior court, that court, upon being informed of the pending test claim, should postpone the proceeding before it and allow the court having primary jurisdiction to determine the test claim.

However, a court's erroneous refusal to stay further proceedings does not render those further proceedings void for lack of jurisdiction. As we explained in *Dowdall*, a court that refuses to defer to another court's primary jurisdiction "is not without jurisdiction." (*Dowdall, supra*, 183 Cal. at p. 353.) Accordingly, notwithstanding pendency of the Los Angeles action, the trial court here did not lack jurisdiction to determine San Diego's mandamus petition. (See *Collins* v. *Ramish* (1920) 182 Cal. 360, 366-369 [188 P. 550] [although trial court erred in refusing to abate action because of former action pending, new trial was not warranted on issues that the trial court correctly decided]; *People* ex rel. *Garamendi* v. *American Autoplan, Inc.* (1993) 20 Cal.App.4th 760, 772 [25 Cal.Rptr.2d 192] (*Garamendi*) ["rule of exclusive concurrent jurisdiction is not 'jurisdictional' in the sense that failure to comply renders subsequent proceedings void"]; *Stearns* v. *Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 718 [53 Cal.Rptr. 482, 21 A.L.R.3d 164] [where trial court errs in failing to stay proceedings in

deference to jurisdiction of another court, reversal would be frivolous absent errors regarding the merits].)[11]

The trial court's failure to defer to the primary jurisdiction of the court hearing the Los Angeles action did not prejudice the state. Contrary to the state's assertion, the trial court did not "usurp" the Commission's "authority to determine, in the first place, whether or not legislation creates a mandate." The Commission had already exercised that authority in the Los Angeles action. Moreover, given the settlement of the Los Angeles action, which included vacating the judgment in that action, the trial court's exercise of jurisdiction here did not result in one of the principal harms that the statutory procedure seeks to prevent: multiple decisions regarding an unfunded mandate question. Finally, the lack of an administrative record specifically relating to San Diego's claim did not prejudice the state because the threshold determination of whether a statute imposes a state mandate is an issue of law. (*County of Fresno* v. *Lehman* (1991) 229 Cal.App.3d 340, 347 [280 Cal.Rptr. 310].) To the extent that an administrative record was necessary, the record developed in the Los Angeles action could have been submitted to the trial court.[12] (See *Los Angeles Unified School Dist.* v. *State of California* (1988) 199 Cal.App.3d 686, 689 [245 Cal.Rptr. 140].)

We also find that, on the facts of this case, San Diego's failure to submit a test claim to the Commission before seeking judicial relief did not affect the superior court's jurisdiction. Ordinarily, counties seeking to pursue an unfunded mandate claim under section 6 must exhaust their administrative remedies. (*Central Delta Water Agency* v. *State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 641 [21 Cal.Rptr.2d 453]; *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 73-77 [222 Cal.Rptr. 750] (*County of Contra Costa*).) However, counties may pursue section 6 claims in superior court without first resorting to administrative remedies if they "can establish an exception to" the exhaustion requirement. (*County of Contra Costa, supra,* 177 Cal.App.3d at p. 77.) The futility exception to the exhaustion requirement applies if a county can "state with assurance that the [Commission] would rule adversely in its own particular case. [Citations.]" (*Lindeleaf* v. *Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 870 [226 Cal.Rptr. 119, 718 P.2d 106]; see also *County of Contra Costa, supra,* 177 Cal.App.3d at pp. 77-78.)

---

[11]In *Garamendi, supra,* 20 Cal.App.4th at pages 771-775, the court discussed procedural requirements for raising a claim that another court has already exercised its concurrent jurisdiction. Given our conclusion that the trial court's error here was not jurisdictional, we express no opinion about this discussion in *Garamendi* or the sufficiency of the state's efforts to raise the issue in this case.

[12]Notably, in discussing the options still available to San Diego, the state asserts that San Diego "might have been able to go to superior court and file a [mandamus] petition based on the record of the prior test claim."

We agree with the trial court and the Court of Appeal that the futility exception applied in this case. As we have previously noted, San Diego invoked this exception by alleging in its cross-complaint that the Commission's denial of its claim was "virtually certain" because the Commission had "previously denied the claims of other counties, ruling that county medical care programs for [adult MIP's] are not state-mandated and, therefore, counties are not entitled to reimbursement . . . ." Given that the Commission rejected the Los Angeles claim (which alleged the same unfunded mandate claim that San Diego alleged) and appealed the judicial reversal of its decision, the trial court correctly determined that further attempts to seek relief from the Commission would have been futile. Therefore, we reject the state's jurisdictional argument and proceed to the merits of the appeal.

## V. Existence of a Mandate Under Section 6

■ In determining whether there is a mandate under section 6, we turn to our decision in *Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830 [244 Cal.Rptr. 677, 750 P.2d 318] (*Lucia Mar*). There, we discussed section 6's application to Education Code section 59300, which "requires a school district to contribute part of the cost of educating pupils from the district at state schools for the severely handicapped." (*Lucia Mar, supra,* at p. 832.) Before 1979, the Legislature had statutorily required school districts "to contribute to the education of pupils from the districts at the state schools [citations] . . . ." (*Id.* at pp. 832-833.) The Legislature repealed the statutory requirements in 1979 and, on July 12, 1979, the state assumed full-funding responsibility. (*Id.* at p. 833.) On July 1, 1980, when section 6 became effective, the state still had full-funding responsibility. On June 28, 1981, Education Code section 59300 took effect. (*Lucia Mar, supra,* at p. 833.)

Various school districts filed a claim seeking reimbursement under section 6 for the payments that Education Code section 59300 requires. The Commission denied the claim, finding that the statute did not impose on the districts a new program or higher level of service. The trial court and Court of Appeal agreed, the latter "reasoning that a shift in the funding of an existing program is not a new program or a higher level of service" under section 6. (*Lucia Mar, supra,* 44 Cal.3d at p. 834.)

We reversed, finding that a contrary result would "violate the intent underlying section 6 . . . ." (*Lucia Mar, supra,* 44 Cal.3d at p. 835.) That section "was intended to preclude the state from shifting to local agencies the financial responsibility for providing public services in view of the[]

restrictions on the taxing and spending power of the local entities" that articles XIII A and XIII B of the California Constitution imposed. (*Lucia Mar, supra,* at pp. 835-836.) "The intent of the section would plainly be violated if the state could, while retaining administrative control of programs it has supported with state tax money, simply shift the cost of the programs to local government on the theory that the shift does not violate section 6 . . . because the programs are not 'new.' Whether the shifting of costs is accomplished by compelling local governments to pay the cost of entirely new programs created by the state, *or by compelling them to accept financial responsibility in whole or in part for a program which was funded entirely by the state before the advent of article XIII B*, the result seems equally violative of the fundamental purpose underlying section 6 . . . ." (*Id.* at p. 836, italics added, fn. omitted.) We thus concluded in *Lucia Mar* "that because [Education Code] section 59300 shifts partial financial responsibility for the support of students in the state-operated schools from the state to school districts—an obligation the school districts did not have at the time article XIII B was adopted—it calls for [the school districts] to support a 'new program' within the meaning of section 6." (*Ibid.*, fn. omitted.)

The similarities between *Lucia Mar* and the case before us "are striking. In *Lucia Mar*, prior to 1979 the state and county shared the cost of educating handicapped children in state schools; in the present case from 1971-197[8] the state and county shared the cost of caring for [adult MIP's] under the Medi-Cal program. . . . [F]ollowing enactment of [article XIII A], the state took full responsibility for both programs." (*Kinlaw, supra,* 54 Cal.3d at p. 353 (dis. opn. of Broussard, J.).) As to both programs, the Legislature cited adoption of article XIII A of the California Constitution, and specifically its effect on tax revenues, as the basis for the state's assumption of full funding responsibility. (Stats. 1979, ch. 237, § 10, p. 493; Stats. 1979, ch. 282, § 106, p. 1059.) "Then in 1981 (for handicapped children) and 1982 (for [adult MIP's]), the state sought to shift some of the burden back to the counties." (*Kinlaw, supra,* 54 Cal.3d at p. 353 (dis. opn. of Broussard, J.).)

Adopting the Commission's analysis in the Los Angeles action, the state nevertheless argues that *Lucia Mar* "is inapposite." The school program at issue in *Lucia Mar* "had been wholly operated, administered and financed by the state" and "was unquestionably a 'state program.' " " 'In contrast,' " the state argues, " 'the program here has never been operated or administered by the State of California. The counties have always borne legal and financial responsibility for' " it under section 17000 and its predecessors.[13] The courts have interpreted section 17000 as "impos[ing] upon counties a duty to

---

[13]"County General Assistance in California dates from 1855, and for many years afforded the only form of relief to indigents." (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 677 [94

provide hospital and medical services to indigent residents. [Citations.]" (*Board of Supervisors* v. *Superior Court* (1989) 207 Cal.App.3d 552, 557 [254 Cal.Rptr. 905].) Thus, the state argues, the source of San Diego's obligation to provide medical care to adult MIP's is section 17000, not the 1982 legislation. Moreover, because the Legislature enacted section 17000 in 1965, and section 6 does not apply to "mandates enacted prior to January 1, 1975," there is no reimbursable mandate. Finally, the state argues that, because section 17001 give counties "complete discretion" in setting eligibility and service standards under section 17000, there is no mandate. A contrary conclusion, the state asserts, "would erroneously expand the definition of what constitutes a 'new program' under" section 6. As we explain, we reject these arguments.

### A. The Source and Existence of San Diego's Obligation

#### 1. The Residual Nature of the Counties' Duty Under Section 17000

The state's argument that San Diego's obligation to provide medical care to adult MIP's predates the 1982 legislation contains numerous errors. First, the state misunderstands San Diego's obligation under section 17000. That section creates "the *residual* fund" to sustain indigents "who cannot qualify . . . under any specialized aid programs." (*Mooney, supra,* 4 Cal.3d at p. 681, italics added; see also *Board of Supervisors* v. *Superior Court, supra,* 207 Cal.App.3d at p. 562; *Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 499 [223 Cal.Rptr. 716] [general assistance "is a program of last resort"].) By its express terms, the statute requires a county to relieve and support indigent persons *only* "when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." (§ 17000.)[14] "Consequently, to the extent that the state or federal governments provide[d] care for [adult MIP's], the [C]ounty's obligation to do so [was] reduced . . . ." (*Kinlaw, supra,* 54 Cal.3d at p. 354, fn. 14 (dis. opn. of Broussard, J.).)[15]

As we have explained, the state began providing adult MIP's with medical care under Medi-Cal in 1971. Although it initially required counties to

Cal.Rptr. 279, 483 P.2d 1231] (*Mooney*).) Section 17000 is substantively identical to former section 2500, which was enacted in 1937. (Stats. 1937, chs. 369, 464, pp. 1097, 1406.)

[14]See also *County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526] (construing former section 2500); *Jennings* v. *Jones* (1985) 165 Cal.App.3d 1083, 1091 [212 Cal.Rptr. 134] (counties must support all indigent persons "having no other means of support"); *Union of American Physicians & Dentists* v. *County of Santa Clara* (1983) 149 Cal.App.3d 45, 51, fn. 10 [196 Cal.Rptr. 602]; *Rogers* v. *Detrich* (1976) 58 Cal.App.3d 90, 95 [128 Cal.Rptr. 261] (counties have duty of support "where such support is not otherwise furnished").

[15]In asserting that Medi-Cal coverage did not supplant San Diego's obligation under section 17000, the dissent incorrectly relies on *Madera Community Hospital* v. *County of Madera* (1984) 155 Cal.App.3d 136 [201 Cal.Rptr. 768] (*Madera*) and *Cooke, supra,* 213 Cal.App.3d

contribute generally to the costs of Medi-Cal, it did not set forth a specific amount for coverage of MIP's. The state was primarily responsible for the costs of the program, and the counties were simply required to contribute funds to defray the state's costs. Beginning with the 1978-1979 fiscal year, the state paid all costs of the Medi-Cal program, including the cost of medical care for adult MIP's. Thus, when section 6 was adopted in November 1979, to the extent that Medi-Cal provided medical care to adult MIP's, San Diego bore no financial responsibility for these health care costs.[16]

The California Attorney General has expressed a similar understanding of Medi-Cal's effect on the counties' medical care responsibility under section 17000. After the 1971 extension of Medi-Cal coverage to MIP's, Fresno County sought an opinion regarding the scope of its duty to provide medical care under section 17000. It asserted that the 1971 repeal of former section 14108.5, which declared the Legislature's concern with the counties' problems in caring for indigents not eligible for Medi-Cal, evidenced a legislative intent to preempt the field of providing health services. (56 Ops.Cal.Atty.Gen., *supra*, at p. 571.) The Attorney General disagreed, concluding that the 1971 change "did not alter the duty of the counties to provide medical care to those indigents not eligible for Medi-Cal." (*Id.* at p. 569.) The Attorney General explained: "The statement of concern acknowledged the obligation of counties to continue to provide medical assistance under section 17000; the removal of the statement of concern was not accompanied by elimination of such duty on the part of the counties, *except as the addition of [MIP's] to the Medi-Cal program would remove the burden on the counties to provide medical care for such persons.*" (*Id.* at p. 571, italics added.)

---

401. (Dis. opn. of Kennard, J., *post*, at p. 115.) In *Madera*, the court voided a county ordinance that extended county benefits under section 17000 only to persons " 'meeting all eligibility standards for the Medi-Cal program.' " (*Madera*, *supra*, 155 Cal.App.3d at p. 150.) The court explained: "Because all funding for the Medi-Cal program comes from either the federal or the state government . . . , [c]ounty has denied any financial obligation whatsoever from county funds for the medical care of its indigent and poor residents." (*Ibid.*) Thus, properly understood, *Madera* held only that Medi-Cal does not relieve counties of their obligation to provide medical care to persons who are "indigent" within the meaning of section 17000 but who are ineligible for Medi-Cal. The limit of *Madera*'s holding is apparent from the court's reliance on a 1979 opinion of the Attorney General discussing the scope of a county's authority under section 17000. (*Madera*, *supra*, 155 Cal.App.3d at pp. 151-152.) The Attorney General explained that "[t]he county obligation [under section 17000] to provide general relief extends to those indigents who do not qualify under specialized aid programs, . . . including Medi-Cal." (62 Ops.Cal.Atty.Gen. 70, 71, fn. 1 (1979).) Moreover, the *Madera* court expressly recognized that state and federal programs "alleviate, to a greater or lesser extent, [a] [c]ounty's burden." (*Madera*, *supra*, 155 Cal.App.3d at p. 151.) In *Cooke*, the court simply made a passing reference to *Madera* in dictum describing the coverage history of Medi-Cal. (*Cooke*, *supra*, 213 Cal.App.3d at p. 411.) It neither analyzed the issue before us nor explained the meaning of the dictum that the dissent cites.

[16]As we have previously explained, even before 1971 the state, through the county option, assumed much of the financial responsibility for providing medical care to adult MIP's.

Indeed, the Legislature's statement of intent in an uncodified section of the 1982 legislation excluding adult MIP's from Medi-Cal suggests that it also shared our understanding of section 17000. Section 8.3 of the 1982 Medi-Cal revisions expressly declared the Legislature's intent "[i]n eliminating [M]edically [I]ndigent [A]dults from the Medi-Cal program . . . ." (Stats. 1982, ch. 328, § 8.3, p. 1575; Stats. 1982, ch. 1594, § 86, p. 6357.) It stated in part: "It is further the intent of the Legislature to provide counties with as much flexibility as possible in organizing county health services to serve *the population being transferred*." (Stats. 1982, ch. 328, § 8.3, p. 1576; Stats. 1982, ch. 1594, § 86, p. 6357, italics added.) If, as the state contends, counties had always been responsible under section 17000 for the medical care of adult MIP's, the description of adult MIP's as "the population being transferred" would have been inaccurate. By so describing adult MIP's, the Legislature indicated its understanding that counties did not have this responsibility while adult MIP's were eligible for Medi-Cal. These sources fully support our rejection of the state's argument that the 1982 legislation did not impose a mandate because, under section 17000, counties had always borne the responsibility for providing medical care to adult MIP's.

2. *The State's Assumption of Full Funding Responsibility for Providing Medical Care to Adult MIP's Under Medi-Cal*

To support its argument that it never relieved counties of their obligation under section 17000 to provide medical care to adult MIP's, the state characterizes as "temporary" the Legislature's assumption of full-funding responsibility for adult MIP's. According to the state, "any ongoing responsibility of the county was, at best, only temporarily, partially, alleviated (and never supplanted)." The state asserts that the Court of Appeal thus "erred by focusing on one phase in th[e] shifting pattern of arrangements" for funding indigent health care, "a focus which led to a myopic conclusion that the state alone is forever responsible for funding the health care for" adult MIP's.

A comparison of the 1978 and 1979 statutes that eliminated the counties' share of Medi-Cal costs refutes the state's claim. The Legislature expressly limited the effect of the 1978 legislation to one fiscal year, providing that the state "shall pay" each county's Medi-Cal cost share "for the period from July 1, 1978, to June 30, 1979." (Stats. 1978, ch. 292, § 33, p. 610.) The Legislative Counsel's Digest explained that this section would require the state to pay "[a]ll county costs for Medi-Cal" for "the 1978-79 fiscal year only." (Legis. Counsel's Dig., Sen. Bill No. 154, 4 Stats. 1978 (Reg. Sess.), Summary Dig., p. 71.) The digest further explained that the purpose of the bill containing this section was "the *partial* relief of local government from the *temporary* difficulties brought about by the approval of Proposition 13."

(*Id.* at p. 70, italics added.) Clearly, the Legislature knew how to include words of limitation when it intended the effects of its provisions to be temporary.

By contrast, the 1979 legislation contains no such limiting language. It simply provided: "Section 14150 of the Welfare and Institutions Code is repealed." (Stats. 1979, ch. 282, § 74, p. 1043.) In setting forth the need to enact the legislation as an urgency statute, the Legislature explained: "The adoption of Article XIII A . . . may cause the curtailment or elimination of programs and services which are vital to the state's public health, safety, education, and welfare. In order that such services not be interrupted, it is necessary that this act take effect immediately." (Stats. 1979, ch. 282, § 106, p. 1059.) In describing the effect of this legislation, the Legislative Counsel first explained that, "[u]nder existing law, the counties pay a specified annual share of the cost of" Medi-Cal. (Legis. Counsel's Dig., Assem. Bill No. 8, 4 Stats. 1979 (Reg. Sess.), Summary Dig., p. 79.) Referring to the 1978 legislation, it further explained that "[f]or the 1978-79 fiscal year only, the state pays . . . [¶] . . . [a]ll county costs for Medi-Cal . . . ." (*Ibid.*) The 1979 legislation, the digest continued, "provid[ed] for state assumption of all county costs of Medi-Cal." (*Ibid.*) We find nothing in the 1979 legislation or the Legislative Counsel's summary indicating a legislative intent to eliminate the counties' cost share of Medi-Cal only temporarily.

The state budget process for the 1980-1981 fiscal year confirms that the Legislature's assumption of all Medi-Cal costs was not viewed as "temporary." In the summary of his proposed budget, then Governor Brown described Assembly Bill No. 8, 1981-1982 Regular Session, generally as "a long-term local financing measure" (Governor's Budget for 1980-1981 as submitted to Legislature (1979-1980 Reg. Sess.) Summary of Local Government Fiscal Relief, p. A-30) through which "[t]he total cost of [the Medi-Cal] program was *permanently* assumed by the State . . . ." (*Id.* at p. A-32, italics added.) Similarly, in describing to the Joint Legislative Budget Committee the Medi-Cal funding item in the proposed budget, the Legislative Analyst explained: "Item 287 includes the state cost of 'buying out' the county share of Medi-Cal expenditures. Following passage of Proposition 13, [Senate Bill No.] 154 appropriated $418 million to relieve counties of all fiscal responsibility for Medi-Cal program costs. Subsequently, [Assembly Bill No.] 8 was enacted, *which made permanent state assumption of county Medi-Cal costs.*" (Legis. Analyst, Rep. to Joint Legis. Budget Com., Analysis of 1980-1981 Budget Bill, Assem. Bill No. 2020 (1979-1980 Reg. Sess.) at p. 721, italics added.) Thus, the state errs in asserting that the 1979 legislation eliminated the counties' financial support of Medi-Cal "only temporarily."

### 3. *State Administration of Medical Care for Adult MIP's Under Medi-Cal*

The state argues that, unlike the school program before us in *Lucia Mar*, *supra*, 44 Cal.3d 830, which "had been wholly operated, administered and financed by the state," the program for providing medical care to adult MIP's " 'has never been operated or administered by' " the state. According to the state, Medi-Cal was simply a state "reimbursement program" for care that section 17000 required counties to provide. The state is incorrect.

One of the legislative goals of Medi-Cal was "to allow eligible persons to secure basic health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." (Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, p. 104.) "In effect, this meant that poorer people could have access to a private practitioner of their choice, and not be relegated to a county hospital program." (*California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 642 [106 Cal.Rptr. 555].) Medi-Cal "provided for reimbursement to both public and private health care providers for medical services rendered." (*Lackner*, *supra*, 97 Cal.App.3d at p. 581.) It further directed that, "[i]nsofar as practical," public assistance recipients be afforded "free choice of arrangements under which they shall receive basic health care." (Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, p. 115.) Finally, since its inception, Medi-Cal has permitted county boards of supervisors to "prescribe rules which authorize the county hospital to integrate its services with those of other hospitals into a system of community service which offers free choice of hospitals to those requiring hospital care. The intent of this section is to eliminate discrimination or segregation based on economic disability so that the county hospital and other hospitals in the community share in providing services to paying patients and to those who qualify for care in public medical care programs." (§ 14000.2.) Thus, "Medi-Cal eligibles were to be able to secure health care in the same manner employed by the general public (i.e., in the private sector or at a county facility)." (1974 Legis. Analyst's Rep., *supra*, at p. 625; see also Preliminary Rep., *supra*, at p. 17.) By allowing eligible persons "a choice of medical facilities for treatment," Medi-Cal placed county health care providers "in competition with private hospitals." (*Hall*, *supra*, 23 Cal.App.3d at p. 1061.)

Moreover, administration of Medi-Cal over the years has been the responsibility of various state departments and agencies. (§§ 10720-10721, 14061-14062, 14105, 14203; *Belshé*, *supra*, 13 Cal.4th at p. 751; *Morris*, *supra*, 67 Cal.2d at p. 741; Summary of Major Events, *supra*, at pp. 2-3, 15.) Thus, "[i]n adopting the Medi-Cal program the state Legislature, for the most part, shifted indigent medical care from being a county responsibility to a State

responsibility under the Medi-Cal program. [Citation.]" (*Bay General Community Hospital* v. *County of San Diego* (1984) 156 Cal.App.3d 944, 959 [203 Cal.Rptr. 184] (*Bay General*); see also Preliminary Rep., *supra*, at p. 18 [with certain exceptions, Medi-Cal "shifted to the state" the responsibility for administration of the medical care provided to eligible persons].) We therefore reject the state's assertion that, while Medi-Cal covered adult MIP's, county facilities were the sole providers of their medical care, and counties both operated and administered the program that provided that care.

The circumstances we have discussed readily distinguish this case from *County of Los Angeles* v. *Commission on State Mandates* (1995) 32 Cal.App.4th 805 [38 Cal.Rptr.2d 304], on which the state relies. There, the court rejected the claim that Penal Code section 987.9, which required counties to provide criminal defendants with certain defense funds, imposed an unfunded state mandate. Los Angeles filed the claim after the state, which had enacted appropriations between 1977 and 1990 "to reimburse counties for their costs under" the statute, made no appropriation for the 1990-1991 fiscal year. (*County of Los Angeles* v. *Commission on State Mandates, supra,* at p. 812.) In rejecting the claim, the court first held that there was no state mandate because Penal Code section 987.9 merely implemented the requirements of federal law. (*County of Los Angeles* v. *Commission on State Mandates, supra,* at pp. 814-816.) Thus, the court stated, "[a]ssuming, arguendo, the provisions of [Penal Code] section 987.9 [constituted] a new program" under section 6, there was no state mandate. (*County of Los Angeles* v. *Commission on State Mandates, supra,* at p. 818.) Here, of course, it is unquestionably the state that has required San Diego to provide medical care to indigent persons.

In dictum, the court also rejected the argument that, under *Lucia Mar, supra,* 44 Cal.3d 830, the state's "decision not to reimburse the counties for their programs under [Penal Code] section 987.9" imposed a new program by shifting financial responsibility for the program to counties. (*County of Los Angeles* v. *Commission on State Mandates, supra,* 32 Cal.App.4th at p. 817.) The court explained: "In contrast [to *Lucia Mar*], the program here has never been operated or administered by the State of California. The counties have always borne legal and financial responsibility for implementing the procedures under [Penal Code] section 987.9. The state merely reimbursed counties for specific expenses incurred by the counties in their operation of a program for which they had a primary legal and financial responsibility." (*Ibid.*) Here, as we have explained, between 1971 and 1983, the state administered and bore financial responsibility for the medical care that adult MIP's received under Medi-Cal. The Medi-Cal program was not simply a

method of reimbursement for county costs. Thus, the state's reliance on this dictum is misplaced.[17]

In summary, our discussion demonstrates the Legislature excluded adult MIP's from Medi-Cal *knowing* and *intending* that the 1982 legislation would trigger the counties' responsibility to provide medical care as providers of last resort under section 17000. Thus, through the 1982 legislation, the Legislature attempted to do precisely that which the voters enacted section 6 to prevent: "transfer[] to [counties] the fiscal responsibility for providing services which the state believed should be extended to the public."[18] (*County of Los Angeles, supra,* 43 Cal.3d at p. 56; see also *City of Sacramento* v. *State of California, supra,* 50 Cal.3d at p. 68 [A "central purpose" of section 6 was "to prevent the state's transfer of the *cost of government* from *itself* to the local level."].) Accordingly, we view the 1982 legislation as having mandated a " 'new program' " on counties by "compelling them to accept financial responsibility in whole or in part for a program," i.e., medical care for adult MIP's, "which was funded entirely by the state before the advent of article XIII B."[19] (*Lucia Mar, supra,* 44 Cal.3d at p. 836.)

A contrary conclusion would defeat the purpose of section 6. Under the state's interpretation of that section, because section 17000 was enacted before 1975, the Legislature could eliminate the *entire* Medi-Cal program and shift to the counties under section 17000 complete financial responsibility for medical care that the state has been providing since 1966. However, the taxing and spending limitations imposed by articles XIII A and XIII B would greatly limit the ability of counties to meet their expanded section 17000 obligation. "County taxpayers would be forced to accept new taxes or see the county forced to cut existing programs further . . . ." (*Kinlaw, supra,* 54 Cal.3d at p. 351 (dis. opn. of Broussard, J.).) As we have previously explained, the voters, recognizing that articles XIII A and XIII B left counties "ill equipped" to assume such increased financial responsibilities, adopted section 6 precisely to avoid this result. (*County of Los Angeles,*

---

[17]Because *County of Los Angeles* v. *Commission on State Mandates, supra,* 32 Cal.App.4th 805, is distinguishable, we need not (and do not) express an opinion regarding the court's analysis in that decision or its conclusions.

[18]The state properly does not contend that the provision of medical care to adult MIP's is not a "program" within the meaning of section 6. (See *County of Los Angeles, supra,* 43 Cal.3d at p. 56 [section 6 applies to "programs that carry out the governmental function of providing services to the public"].)

[19]Alternatively, the 1982 legislation can be viewed as having mandated an increase in the services that counties were providing through existing section 17000 programs, by adding adult MIP's to the indigent population that counties already had to serve under that section. (See *County of Los Angeles, supra,* 43 Cal.3d at p. 56 ["subvention requirement for increased or higher level of service is directed to state mandated increases in the services provided by local agencies in existing 'programs' "].)

*supra*, 43 Cal.3d at p. 61.) Thus, it was the voters who decreed that we must, as the state puts it, "focus[] on one phase in th[e] shifting pattern of [financial] arrangements" between the state and the counties. Under section 6, the state simply cannot "compel[] [counties] to accept financial responsibility in whole or in part for a program which was funded entirely by the state before the advent of article XIII B . . . ."[20] (*Lucia Mar, supra,* 44 Cal.3d at p. 836.)

### B. *County Discretion to Set Eligibility and Service Standards*

■■ The state next argues that, because San Diego had statutory discretion to set eligibility and service standards, there was no reimbursable mandate. Citing section 16704, the state asserts that the 1982 legislation required San Diego to spend MISA funds "only on those whom the <u>county</u> deems eligible <u>under</u> § 17000," "gave the county exclusive authority to determine the level and type of benefits it would provide," and required counties "to include [adult MIP's] in their § 17000 eligibility **only to the extent state funds were available and then only for 3 years.**" (Original emphasis.)[21] According to the state, under section 17001, "[t]he counties

---

[20]In reaching a contrary conclusion, the dissent ignores the electorate's purpose in adopting section 6. The dissent also mischaracterizes our decision. We do not hold that "whenever there is a change in a state program that has the effect of increasing a county's financial burden under section 17000 there must be reimbursement by the state." (Dis. opn. of Kennard, J., *post,* at p. 116.) Rather, we hold that section 6 prohibits the state from shifting to counties the costs of state programs for which the state assumed complete financial responsibility before adoption of section 6. Whether the state may discontinue assistance that it initiated after section 6's adoption is a question that is not before us.

[21]As amended in 1982, section 16704, subdivision (c)(1), provided in relevant part: "The [county board of supervisors] shall assure that it will expend [MISA] funds only for the health services specified in Sections 14132 and 14021 provided to persons certified as eligible for such services pursuant to Section 17000 and shall assure that it will incur no less in net costs of county funds for county health services in any fiscal year than the amount required to obtain the maximum allocation under Section 16702." (Stats. 1982, ch. 1594, § 70, p. 6346.) Section 16704, subdivision (c)(3), provided in relevant part: "Any person whose income and resources meet the income and resource criteria for certification for services pursuant to Section 14005.7 other than for the aged, blind, or disabled, shall not be excluded from eligibility for services to the extent that state funds are provided. Such persons may be held financially liable for these services based upon the person's ability to pay. A county may not establish a payment requirement which would deny medically necessary services. This section shall not be construed to mandate that a county provide any specific level or type of health care service . . . . The provisions of this paragraph shall become inoperative if a court ruling is issued which decrees that the provisions of this paragraph mandates [*sic*] that additional state funds be provided and which requires that additional state reimbursement be made to counties for costs incurred under this paragraph. This paragraph shall be operative only until June 30, 1983, unless a later enacted statute extends or deletes that date." (Stats. 1982, ch. 1594, § 70, pp. 6346-6347.)

have complete discretion over the determination of eligibility, scope of benefits and how the services will be provided."[22]

The state exaggerates the extent of a county's discretion under section 17001. It is true "case law . . . has recognized that section 17001 confers broad discretion upon the counties in performing their statutory duty to provide general assistance benefits to needy residents. [Citations.]" (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 211 [211 Cal.Rptr. 398, 695 P.2d 695] (*Robbins*).) However, there are "clear-cut limits" to this discretion. (*Ibid.*) ■ The counties may exercise their discretion "only within fixed boundaries. In administering General Assistance relief the county acts as an agent of the state. [Citation.] When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose. (Gov. Code, § 11374.)" (*Mooney, supra,* 4 Cal.3d at p. 679.) Thus, the counties' eligibility and service standards must "carry out" the objectives of section 17000. (*Mooney, supra,* 4 Cal.3d at p. 679; see also *Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295, 304-305 [261 Cal.Rptr. 545]; § 11000 ["provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program"].) County standards that fail to carry out section 17000's objectives "are void and no protestations that they are merely an exercise of administrative discretion can sanctify them." (*Morris, supra,* 67 Cal.2d at p. 737.) Courts, which have " 'final responsibility for the interpretation of the law,' " must strike them down. (*Id.* at p. 748.) Indeed, despite the counties' statutory discretion, "courts have consistently invalidated . . . county welfare regulations that fail to meet statutory requirements. [Citations.]" (*Robbins, supra,* 38 Cal.3d at p. 212.)

### 1. *Eligibility*

■ Regarding eligibility, we conclude that counties must provide medical care to all adult MIP's. As we emphasized in *Mooney,* section 17000 requires counties to relieve and support " '*all indigent persons* lawfully resident therein, "when such persons are not supported and relieved by their relatives" or by some other means.' " (*Mooney, supra,* 4 Cal.3d at p. 678; see also *Bernhardt* v. *Board of Supervisors* (1976) 58 Cal.App.3d 806, 811 [130 Cal.Rptr. 189].) Moreover, section 10000 declares that the statutory "purpose" of division 9 of the Welfare and Institutions Code, which includes section 17000, "is to provide for protection, care, and assistance to the

---

[22]Section 17001 provides: "The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county."

people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to *all* of its needy and distressed." (Italics added.) Thus, counties have no discretion to refuse to provide medical care to "indigent persons" within the meaning of section 17000 who do not receive it from other sources.[23] (See *Bell* v. *Board of Supervisors* (1994) 23 Cal.App.4th 1695, 1706 [28 Cal.Rptr.2d 919] [eligibility standards may not "defeat the purpose of the statutory scheme by depriving qualified recipients of mandated support"]; *Washington* v. *Board of Supervisors* (1993) 18 Cal.App.4th 981, 985 [22 Cal.Rptr.2d 852] [courts have repeatedly "voided county ordinances which have attempted to redefine eligibility standards set by state statute"].)

Although section 17000 does not define the term "indigent persons," the 1982 legislation made clear that all adult MIP's fall within this category for purposes of defining a county's obligation to provide medical care.[24] As part of its exclusion of adult MIP's, that legislation required counties to participate in the MISA program. (Stats. 1982, ch. 1594, §§ 68, 70, 86, pp. 6343-6347, 6357.) Regarding that program, the 1982 legislation amended section 16704, subdivision (c)(1), to require that a county board of supervisors, in applying for MISA funds, "assure that it will expend such funds only for [specified] health services . . . provided to persons certified as eligible for such services pursuant to Section 17000 . . . ." (Stats. 1982, ch. 1594, § 70, p. 6346.) At the same time, the 1982 legislation amended section 16704, subdivision (c)(3), to provide that "[a]ny person whose income and resources meet the income and resource criteria for certification for services pursuant to Section 14005.7 other than for the aged, blind, or disabled, shall not be excluded from eligibility for services to the extent that state funds are provided." (Stats. 1982, ch. 1594, § 70, p. 6346.) As the state correctly explains, under this provision, "counties had to include [Medically Indigent Adults] in their [section] 17000 eligibility" standards. By requiring counties to make all adult MIP's eligible for services paid for with MISA funds, while at the same time requiring counties to promise to spend such funds *only* on those certified as eligible under section 17000, the Legislature established that all adult MIP's are "indigent persons" for purposes of the counties' duty to provide medical care under section 17000. Otherwise, the counties could not comply with their promise.

[23]We disapprove *Bay General, supra,* 156 Cal.App.3d at pages 959-960, insofar as it (1) states that a county's responsibility under section 17000 extends only to indigents as defined by the county's board of supervisors, and (2) suggests that a county may refuse to provide medical care to persons who are "indigent" within the meaning of section 17000 but do not qualify for Medi-Cal.

[24]Our conclusion is limited to this aspect of a county's duty under section 17000. We express no opinion regarding the scope of a county's duty to provide other forms of relief and support under section 17000.

Our conclusion is not affected by language in section 16704, subdivision (c)(3), making it "operative only until June 30, 1985, unless a later enacted statute extends or deletes that date."[25] As we have explained, the subdivision established that adult MIP's are "indigent persons" within the meaning of section 17000 for medical care purposes. As we have also explained, section 17000 requires counties to relieve and support *all* "indigent persons." Thus, even if the state is correct in asserting that section 16704, subdivision (c)(3), is now inoperative and no longer prohibits counties from excluding adult MIP's from eligibility for medical services, section 17000 has that effect.[26]

Additionally, the coverage history of Medi-Cal demonstrates that the Legislature has always viewed all adult MIP's as "indigent persons" within the meaning of section 17000 for medical care purposes. As we have previously explained, when the Legislature created the original Medi-Cal program, which covered only categorically linked persons, it "declar[ed] its concern with the problems which [would] be facing the counties with respect to the medical care of indigent persons who [were] not covered" by Medi-Cal, "whose medical care [had to] be financed entirely by the counties in a time of heavily increasing medical costs." (Stats. 1966, Second Ex. Sess. 1965, ch. 4, § 2, p. 116 [enacting former § 14108.5].) Moreover, to ensure that the counties' Medi-Cal cost share would not leave counties "with insufficient funds to provide hospital care for those persons not eligible for Medi-Cal," the Legislature also created the county option. (*Hall*, *supra*, 23 Cal.App.3d at p. 1061.) Through the county option, "the state agreed to assume all county health care costs . . . in excess of county costs incurred during the 1964-1965 fiscal year, adjusted for population increases." (*Lackner*, *supra*, 97 Cal.App.3d at p. 586.) Thus, the Legislature expressly recognized that the categorically linked persons initially eligible for Medi-Cal did not constitute all "indigent persons" entitled to medical care under section 17000, and required the state to share in the financial responsibility for providing that care.

In adding adult MIP's to Medi-Cal in 1971, the Legislature extended Medi-Cal coverage to noncategorically linked persons "who [were] financially unable to pay for their medical care." (Legis. Counsel's Dig., Assem. Bill No. 949, 3 Stats. 1971 (Reg. Sess.) Summary Dig., p. 83.) This

---

[25]The 1982 legislation made the subdivision operative until June 30, 1983. (Stats. 1982, ch. 1594, § 70, p. 6347.) In 1983, the Legislature repealed and reenacted section 16704, and extended the operative date of subdivision (c)(3) to June 30, 1985. (Stats. 1983, ch. 323, §§ 131.1, 131.2, pp. 1079-1080.)

[26]Given our analysis, we express no opinion about the statement in *Cooke*, *supra*, 213 Cal.App.3d at page 412, footnote 9, that the "life" of section 16704, subdivision (c)(3), "was implicitly extended" by the fact that the "paragraph remains in the statute despite three subsequent amendments to the statute . . . ."

description was consistent with prior judicial decisions that, for purposes of a county's duty to provide "indigent persons" with hospitalization, had defined the term to include a person "who has insufficient means to pay for his maintenance in a private hospital after providing for those who legally claim his support." (*Goodall* v. *Brite* (1936) 11 Cal.App.2d 540, 550 [54 P.2d 510].)

Moreover, the fate of amendments to section 17000 proposed at the same time suggests that, in the Legislature's view, the category of "indigent persons" entitled to medical care under section 17000 extended even *beyond* those eligible for Medi-Cal as MIP's. The June 17, 1971, version of Assembly Bill No. 949 amended section 17000 by adding the following: "however, the health needs of such persons shall be met under [Medi-Cal]." (Assem. Bill No. 949 (1971 Reg. Sess.) § 53.3, as amended June 17, 1971.) The Assembly deleted this amendment on July 20, 1971. (Assem. Bill No. 949 (1971 Reg. Sess.) as amended July 20, 1971, p. 37.) Regarding this change, the Assembly Committee on Health explained: "The proposed amendment to Section 17000, . . . which would have removed the counties' responsibilities as health care provider of last resort, is deleted. This change was originally proposed to clarify the guarantee to hold counties harmless from additional Medi-Cal costs. It is deleted since it cannot remove the fact that counties are, by definition, a 'last resort' for any person, with or without the means to pay, who does not qualify for federal or state aid." (Assem. Com. on Health, Analysis of Assem. Bill No. 949 (1971 Reg. Sess.) as amended July 20, 1971 (July 21, 1971), p. 4.)

The Legislature's failure to amend section 17000 in 1971 figured prominently in the Attorney General's interpretation of that section only two years later. In a 1973 published opinion, the Attorney General stated that the 1971 inclusion of MIP's in Medi-Cal "did not alter the duty of the counties to provide medical care to those indigents not eligible for Medi-Cal." (56 Ops.Cal.Atty.Gen., *supra*, at p. 569.) He based this conclusion on the 1971 legislation, relevant legislative history, and "the history of state medical care programs." (*Id.* at p. 570.) The opinion concluded: "The definition of medically indigent in [the chapter establishing Medi-Cal] is applicable only to that chapter and *does not include all those enumerated in section 17000*. If the former medical care program, by providing care only for a specific group, public assistance recipients, did not affect the responsibility of the counties to provide such service under section 17000, we believe the most recent expansion of the medical assistance program does not affect, *absent an express legislative intent to the contrary*, the duty of the counties under section 17000 to continue to provide services to those eligible under section 17000 but not under [Medi-Cal]." (*Ibid.*, italics added.) The Attorney General's opinion, although not binding, is entitled to considerable weight.

(*Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 829 [25 Cal.Rptr.2d 148, 863 P.2d 218].) Absent controlling authority, it is persuasive because we presume that the Legislature was cognizant of the Attorney General's construction of section 17000 and would have taken corrective action if it disagreed with that construction. (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].)

In this case, of course, we need not (and do not) decide whether San Diego's obligation under section 17000 to provide medical care extended beyond adult MIP's. Our discussion establishes, however, that the obligation extended *at least* that far. The Legislature has made it clear that all adult MIP's are "indigent persons" under section 17000 for purposes of San Diego's obligation to provide medical care. Therefore, the state errs in arguing that San Diego had discretion to refuse to provide medical care to this population.[27]

## 2. *Service Standards*

■ A number of statutes are relevant to the state's argument that San Diego had discretion in setting service standards. Section 17000 requires in general terms that counties "relieve and support" indigent persons. Section 10000, which sets forth the purpose of the division containing section 17000, declares the "legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life," so "as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society." (§ 10000.) "Section 17000, as authoritatively interpreted, mandates that medical care be provided to indigents and section 10000 requires that such care be provided promptly and humanely. The duty is mandated by statute. There is no discretion concerning whether to provide such care . . . ." (*Tailfeather* v. *Board of Supervisors* (1996) 48 Cal.App.4th 1223, 1245 [56 Cal.Rptr.2d 255] (*Tailfeather*).)

Courts construing section 17000 have held that it "imposes a mandatory duty upon all counties to provide 'medically necessary care,' not just

---

[27]Although asserting that nothing required San Diego to provide "all" adult MIP's with medical care, the state never precisely identifies which adult MIP's were legally entitled to medical care and which ones were not. Nor does the state ever directly assert that some adult MIP's were not "indigent persons" under section 17000. On the contrary, despite its argument, the state seems to suggest that San Diego's medical care obligation under section 17000 extended even beyond adult MIP's. It asserts: "At no time prior to or following 1983 did Medi-Cal ever provide medical services to, or pay for medical services provided to, all persons who could not afford such services and therefore might be deemed 'medically indigent.' . . . For some period prior to 1983, Medi-Cal paid for services for some indigent adults under its 'medically indigent adults' category. . . . [A]t no time did the state ever assume financial responsibility for all adults who are too indigent to afford health care." (Original emphasis.)

emergency care. [Citation.]" (*County of Alameda* v. *State Bd. of Control* (1993) 14 Cal.App.4th 1096, 1108 [18 Cal.Rptr.2d 487]; see also *Gardner* v. *County of Los Angeles* (1995) 34 Cal.App.4th 200, 216 [40 Cal.Rptr.2d 271]; § 16704.1 [prohibiting a county from requiring payment of a fee or charge "before [it] renders medically necessary services to . . . persons entitled to services under Section 17000"].) It further "ha[s] been interpreted . . . to impose a minimum standard of care below which the provision of medical services may not fall." (*Tailfeather, supra,* 48 Cal.App.4th at p. 1239.) In *Tailfeather,* the court stated that "section 17000 requires provision of medical services to the poor at a level which does not lead to unnecessary suffering or endanger life and health . . . ." (*Id.* at p. 1240.) In reaching this conclusion, it cited *Cooke, supra,* 213 Cal.App.3d at page 404, which held that section 17000 requires counties to provide "dental care sufficient to remedy substantial pain and infection." (See also § 14059.5 [defining "[a] service [as] 'medically necessary' . . . when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain"].)

During the years for which San Diego sought reimbursement, Health and Safety Code section 1442.5, former subdivision (c) (former subdivision (c)), also spoke to the level of services that counties had to provide under Welfare and Institutions Code section 17000.[28] As enacted in September 1974, former subdivision (c) provided that, whether a county's duty to provide care to all indigent people "is fulfilled directly by the county or through alternative means, the availability of services, and the quality of the treatment received by people who cannot afford to pay for their health care shall be the same as that available to nonindigent people receiving health care services in private facilities in that county." (Stats. 1974, ch. 810, § 3, p. 1765.) The express "purpose and intent" of the act that contained former subdivision (c) was "to insure that the duty of counties to provide health care to indigents [was] properly and continuously fulfilled." (Stats. 1974, ch. 810, § 1, p. 1764.) Thus, until its repeal in September 1992,[29] former subdivision (c) "[r]equire[d] that the availability and quality of services provided to indigents directly by the county or alternatively be the same as that available to nonindigents in private facilities in that county." (Legis. Counsel's Dig., Sen. Bill No. 2369, 2 Stats. 1974 (Reg. Sess.) Summary Dig., p. 130; see also *Gardner* v. *County of Los Angeles, supra,* 34 Cal.App.4th at p. 216;

[28]The state argues that former subdivision (c) is irrelevant to our determination because, like section 17000, it "predate[d] 1975." Our previous analysis rejecting this argument in connection with section 17000 applies here as well.

[29]Statutes 1992, chapter 719, section 2, page 2882, repealed former subdivision (c) and enacted a new subdivision (c) in its place. This urgency measure was approved by the Governor on September 14, 1992, and filed with the Secretary of State on September 15, 1992.

*Board of Supervisors* v. *Superior Court, supra*, 207 Cal.App.3d at p. 564 [former subdivision (c) required that care provided "be *comparable* to that enjoyed by the nonindigent"].)[30] "For the 1990-91 fiscal year," the Legislature qualified this obligation by providing: "nothing in [former] subdivision (c) . . . shall require any county to exceed the standard of care provided by the state Medi-Cal program. Notwithstanding any other provision of law, counties shall not be required to increase eligibility or expand the scope of services in the 1990-91 fiscal year for their programs." (Stats. 1990, ch. 457, § 23, p. 2013.)

Although we have identified statutes relevant to service standards, we need not here define the precise contours of San Diego's statutory health care obligation. The state argues generally that San Diego had discretion regarding the services it provided. However, the state fails to identify either the specific services that San Diego provided under its CMS program or which of those services, if any, were not required under the governing statutes. Nor does the state argue that San Diego could have eliminated all services and complied with statutory requirements. Accordingly, we reject the state's argument that, because San Diego had some discretion in providing services, the 1982 legislation did not impose a reimbursable mandate.[31]

## VI. MINIMUM REQUIRED EXPENDITURE

■ The Court of Appeal held that, under the governing statutes, the Commission must initially determine the precise amount of any reimbursement due San Diego. It therefore reversed the damages portion of the trial court's judgment and remanded the matter to the Commission for this determination. Nevertheless, the Court of Appeal affirmed the trial court's finding that the Legislature required San Diego to spend at least $41 million on its CMS program for fiscal years 1989-1990 and 1990-1991. In affirming this finding, the Court of Appeal relied primarily on section 16990, subdivision (a), as it read at all relevant times. The state contends this provision did not mandate that San Diego spend any minimum amount on the CMS program. It further asserts that the Court of Appeal's "ruling in effect sets a damages baseline, in contradiction to [its] ostensible reversal of the damage award."

---

[30]We disapprove *Cooke, supra*, 213 Cal.App.3d at page 410, to the extent it held that Health and Safety Code section 1442.5, former subdivision (c), was merely "a limitation on a county's ability to close facilities or reduce services provided in those facilities," and was irrelevant absent a claim that a "county facility was closed [or] that any services in [the] county . . . were reduced." Although former subdivision (c) was contained in a section that dealt in part with closures and service reductions, nothing limited its reach to that context.

[31]During further proceedings before the Commission to determine the amount of reimbursement due San Diego, the state may argue that particular services available under San Diego's CMS program exceeded statutory requirements.

Former section 16990, subdivision (a), set forth the financial maintenance-of-effort requirement for counties that received funding under the California Healthcare for the Indigent Program (CHIP). The Legislature enacted CHIP in 1989 to implement Proposition 99, the Tobacco Tax and Health Protection Act of 1988 (codified at Rev. & Tax. Code, § 30121 et seq.). Proposition 99, which the voters approved on November 8, 1988, increased the tax on tobacco products and allocated the resulting revenue in part to medical and hospital care for certain persons who could not afford those services. (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 248, 254 [279 Cal.Rptr. 325, 806 P.2d 1360].) During the 1989-1990 and 1990-1991 fiscal years, former section 16990, subdivision (a), required counties receiving CHIP funds, "at a minimum," to "maintain a level of financial support of county funds for health services at least equal to its county match and any overmatch of county funds in the 1988-89 fiscal year," adjusted annually as provided. (Stats. 1989, ch. 1331, § 9, p. 5427.) Applying this provision, the Court of Appeal affirmed the trial court's finding that the state had required San Diego to spend in fiscal years 1989-1990 and 1990-1991 at least $41 million on the CMS program.

We agree with the state that this finding is erroneous. Unlike participation in MISA, which was mandatory, participation in CHIP was voluntary. In establishing CHIP, the Legislature appropriated funds "for allocation to counties *participating* in" the program. (Stats. 1989, ch. 1331, § 10, p. 5436, italics added.) Section 16980, subdivision (a), directed the State Department of Health Services to make CHIP payments "upon application of the county assuring that it will comply with" applicable provisions. Among the governing provisions were former sections 16990, subdivision (a), and 16995, subdivision (a), which provided: "To be eligible for receipt of funds under this chapter, a county may not impose more stringent eligibility standards for the receipt of benefits under Section 17000 or reduce the scope of benefits compared to those which were in effect on November 8, 1988." (Stats. 1989, ch. 1331, § 9, p. 5431.)

However, San Diego has cited no provision, and we have found none, that *required* eligible counties to participate in the program or apply for CHIP funds. Through Revenue and Taxation Code section 30125, which was part of Proposition 99, the electorate directed that funds raised through Proposition 99 "shall be used to supplement existing levels of service and not to fund existing levels of service." (See also Stats. 1989, ch. 1331, §§ 1, 19, pp. 5382, 5438.) Counties not wanting to supplement their existing levels of service, and which therefore did not want CHIP funds, were not bound by the program's requirements. Those counties, including San Diego, that chose

to seek CHIP funds did so voluntarily.[32] Thus, the Court of Appeal erred in concluding that former section 16990, subdivision (a), mandated a minimum funding requirement for San Diego's CMS program.

Nor did former section 16991, subdivision (a)(5), which the trial court and Court of Appeal also cited, establish a minimum financial obligation for San Diego's CMS program. Former section 16991 generally "establish[ed] a procedure for the allocation of funds to each county receiving funds from the [MISA] . . . for the provision of services to persons meeting certain Medi-Cal eligibility requirements, based on the percentage of newly legalized individuals under the federal Immigration Reform and Control Act (IRCA)." (Legis. Counsel's Dig., Assem. Bill No. 75, 4 Stats. 1989 (Reg. Sess.) Summary Dig., p. 548.) Former section 16991, subdivision (a)(5), required the state, for fiscal years 1989-1990 and 1990-1991, to reimburse a county if its combined allocation from various sources was less than the funding it received under section 16703 for fiscal year 1988-1989.[33] Nothing about this state reimbursement requirement imposed on San Diego a minimum funding requirement for its CMS program.

Thus, we must reverse the judgment insofar as it finds that former sections 16990, subdivision (a), and 16991, subdivision (a)(5), established a $41 million spending floor for San Diego's CMS program. Instead, the various statutes that we have previously discussed (e.g., §§ 10000, 17000, and Health & Saf. Code, § 1442.5, former subd. (c)), the cases construing those statutes, and any other relevant authorities must guide the Commission's determination of the level of services that San Diego had to provide and any reimbursement to which it is entitled.

---

[32]Consistent with the electorate's direction, in its application for CHIP funds, San Diego assured the state that it would "[e]xpend [CHIP] funds only to supplement existing levels of services provided and not to fund existing levels of service . . . ." Because San Diego's initial decision to seek CHIP funds was voluntary, the evidence it cites of state threats to withhold CHIP funds if it eliminated the CMS program is irrelevant.

[33]Former section 16991, subdivision (a)(5), provided in full: "If the sum of funding that a county received from its allocation pursuant to Section 16703, the amount of reimbursement it received from federal State Legalization Impact Assistance Grant [(SLIAG)] funding for indigent care, and its share of funding provided in this section is less than the amount of funding the county received pursuant to Section 16703 in fiscal year 1988-89 the state shall reimburse the county for the amount of the difference. For the 1990-91 fiscal year, if the sum of funding received from its allocation, pursuant to Section 16703 and the amount of reimbursement it received from [SLIAG] Funding for indigent care that year is less than the amount of funding the county received pursuant to Section 16703 in the 1988-89 fiscal year, the state shall reimburse the amount of the difference. If the department determines that the county has not made reasonable efforts to document and claim federal SLIAG funding for indigent care, the department shall deny the reimbursement." (Stats. 1989, ch. 1331, § 9, p. 5428.)

## VII. Remaining Issues

The state raises a number of additional issues. It first complains that a mandamus proceeding under Code of Civil Procedure section 1085 was an improper vehicle for challenging the Commission's position. It asserts that, under Government Code section 17559, review by administrative mandamus under Code of Civil Procedure section 1094.5 is the exclusive method for challenging a Commission decision denying a mandate claim. The Court of Appeal rejected this argument, reasoning that the trial court had jurisdiction under Code of Civil Procedure section 1085 because, under section 6, the state has a ministerial duty of reimbursement when it imposes a mandate.

Like the Court of Appeal, but for different reasons, we reject the state's argument. "[M]andamus pursuant to [Code of Civil Procedure] section 1094.5, commonly denominated 'administrative' mandamus, is mandamus still. It is not possessed of 'a separate and distinctive legal personality. It is not a remedy removed from the general law of mandamus or exempted from the latter's established principles, requirements and limitations.' [Citations.] The full panoply of rules applicable to 'ordinary' mandamus applies to 'administrative' mandamus proceedings, except where modified by statute. [Citations.]" (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 673-674 [170 Cal.Rptr. 484, 620 P.2d 1032].) Where the entitlement to mandamus relief is adequately alleged, a trial court may treat a proceeding brought under Code of Civil Procedure section 1085 as one brought under Code of Civil Procedure section 1094.5 and should deny a demurrer asserting that the wrong mandamus statute has been invoked. (*Woods, supra,* 28 Cal.3d at pp. 673-674; *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 813-814 [140 Cal.Rptr. 442, 567 P.2d 1162].) Thus, even if San Diego identified the wrong mandamus statute, the error did not affect the trial court's ability to grant mandamus relief.

"In any event, distinctions between traditional and administrative mandate have little impact on this appeal . . . ." (*McIntosh* v. *Aubry* (1993) 14 Cal.App.4th 1576, 1584 [18 Cal.Rptr.2d 680].) The determination whether the statutes here at issue established a mandate under section 6 is a question of law. (*County of Fresno* v. *Lehman, supra,* 229 Cal.App.3d at p. 347.) In reaching our conclusion, we have relied on no facts that are in dispute. Where, as here, a "purely legal question" is at issue, courts "exercise independent judgment . . . , no matter whether the issue arises by traditional or administrative mandate. [Citations.]" (*McIntosh, supra,* 14 Cal.App.4th at p. 1584.) As the state concedes, even under Code of Civil Procedure section 1094.5, a judgment must "be reversed if based on erroneous conclusions of law." Thus, any differences between the two mandamus statutes have had no impact on our analysis.

The state next contends that the trial court prejudicially erred in denying the "peremptory disqualification" motion that the Director of the Department of Finance filed under Code of Civil Procedure section 170.6. We will not review this ruling, however, because it is reviewable only by writ of mandate under Code of Civil Procedure section 170.3, subdivision (d). (*People* v. *Webb* (1993) 6 Cal.4th 494, 522-523 [24 Cal.Rptr.2d 779, 862 P.2d 779]; *People* v. *Hull* (1991) 1 Cal.4th 266 [2 Cal.Rptr.2d 526, 820 P.2d 1036].)

Nor can we address the state's argument that the trial court erred in granting a preliminary injunction. The May 1991 order granting the preliminary injunction was "immediately and separately appealable" under Code of Civil Procedure section 904.1, subdivision (a)(6). (*Art Movers, Inc.* v. *Ni West, Inc.* (1992) 3 Cal.App.4th 640, 645 [4 Cal.Rptr.2d 689].) Thus, the state's attempt to challenge the order in an appeal filed after entry of final judgment in December 1992 was untimely.[34] (See *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 251 [256 Cal.Rptr. 194].) Moreover, the state's attempt to appeal the order granting the preliminary injunction is moot because of (1) the trial court's July 1 order granting a peremptory writ of mandate, which expressly "supersede[d] and replace[d]" the preliminary injunction order and (2) entry of final judgment. (*Sheward* v. *Citizens' Water Co.* (1891) 90 Cal. 635, 638-639 [27 P. 439]; *People* v. *Morse* (1993) 21 Cal.App.4th 259, 264-265 [25 Cal.Rptr.2d 816]; *Art Movers, Inc., supra,* 3 Cal.App.4th at p. 647.)

Finally, the state requests that we reverse the trial court's reservation of jurisdiction regarding an award of attorney fees. This request is premature. In the judgment, the trial court "retain[ed] jurisdiction to determine any right to and amount of attorneys' fees . . . ." This provision does not declare that San Diego in fact has a right to an award of attorney fees. Nor has San Diego asserted such a right. As San Diego states, at this point, "[t]here is nothing for this Court to review." We will not give an advisory ruling on this issue.

## VIII. DISPOSITION

The judgment of the Court of Appeal is affirmed insofar as it holds that the exclusion of adult MIP's from Medi-Cal imposed a mandate on San Diego within the meaning of section 6. The judgment is reversed insofar as it holds that the state required San Diego to spend at least $41 million on the CMS program in fiscal years 1989-1990 and 1990-1991. The matter is

---

[34]Despite its argument here, when it initially appealed, the state apparently recognized that it could no longer challenge the May 1991 order. In its March 1993 notice of appeal, it appealed only from the judgment entered December 18, 1992, and did not mention the May 1991 order.

remanded to the Commission to determine whether, and by what amount, the statutory standards of care (e.g., Health & Saf. Code, § 1442.5, former subd. (c); Welf. & Inst. Code, §§ 10000, 17000) forced San Diego to incur costs in excess of the funds provided by the state, and to determine the statutory remedies to which San Diego is entitled.

George, C. J., Mosk, J., Baxter, J., Anderson, J.,* and Aldrich, J.,† concurred.

**KENNARD, J.**—I dissent.

As part of an initiative measure placing spending limits on state and local government, the voters in 1979 added article XIII B to the California Constitution. Section 6 of this article provides that when the state "mandates a new program or higher level of service on any local government," the state must reimburse the local government for the cost of such program or service. Under subdivision (c) of this constitutional provision, however, the state "may, but need not," provide such reimbursement *if the state mandate was enacted before January 1, 1975.* (Cal. Const., art. XIII B, § 6, subd. (c).) Subdivision (c) is the critical provision here.

Because the counties have for many decades been under a state mandate to provide for the poor, a mandate that existed before the voters added article XIII B to the state Constitution, the express language of subdivision (c) of section 6 of article XIII B exempts the state from any *legal obligation* to reimburse the counties for the cost of medical care to the needy. The fact that for a certain period after 1975 the state directly paid under the state Medi-Cal program for these costs did not lead to the creation of a new mandate once the state stopped doing so. To hold to the contrary, as the majority does, is to render subdivision (c) a nullity.

The issue here is not whether the poor are entitled to medical care. They are. The issue is whether the state or the counties must pay for this care. The majority places this obligation on the state. The counties' win, however, may be a pyrrhic victory. For, in anticipation of today's decision, the Legislature has enacted legislation that will drastically reduce the counties' share of other state revenue, as discussed in part III below.

I

Beginning in 1855, California imposed a legal obligation on the counties to take care of their poor. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 677-678

*Presiding Justice, Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Associate Justice, Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[94 Cal.Rptr. 279, 483 P.2d 1231].) Since 1965, this obligation has been codified in Welfare and Institutions Code section 17000. (Stats. 1965, ch. 1784, § 5, p. 4090.) That statute states in full: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." (Welf. & Inst. Code, § 17000.) Included in this is a duty to provide medical care to indigents. (*Board of Supervisors* v. *Superior Court* (1989) 207 Cal.App.3d 552, 557 [254 Cal.Rptr. 905].)

A brief overview of the efforts by federal, state, and local governments to furnish medical services to the poor may be helpful.

Before March 1, 1966, the date on which California began its Medi-Cal program, medical services for the poor "were provided in different ways and were funded by the state, county, and federal governments in varying amounts." (Assem. Com. on Public Health, Preliminary Rep. on Medi-Cal (Feb. 29, 1968) p. 3.) The Medi-Cal program, which California adopted to implement the federal Medicaid program (42 U.S.C. § 1396 et seq.; see *Morris* v. *Williams* (1967) 67 Cal.2d 733, 738 [63 Cal.Rptr. 689, 433 P.2d 697]), at first limited eligibility to those persons "linked" to a federal categorical aid program by being over age 65, blind, disabled, or a member of a family with dependent children. (Legis. Analyst, Rep. to Joint Legis. Budget Com., Analysis of 1971-1972 Budget Bill, Sen. Bill No. 207 (1971 Reg. Sess.), pp. 548, 550.) Persons not linked to federal programs were ineligible for Medi-Cal; they could obtain medical care from the counties. (*County of Santa Clara* v. *Hall* (1972) 23 Cal.App.3d 1059, 1061 [100 Cal.Rptr. 629].)

In 1971, the Legislature revised Medi-Cal by extending coverage to certain so-called "noncategorically linked" persons, or "medically indigent persons." (Stats. 1971, ch. 577, §§ 12, 13, 22.5, 23, pp. 1110-1111, 1115.) The revisions included a formula for determining each county's share of Medi-Cal costs for the 1972-1973 fiscal year, with increases in later years based on the assessed value of property. (*Id.* at §§ 41, 42, pp. 1131-1133.)

In 1978, California voters added to the state Constitution article XIII A (Proposition 13), which severely limited property taxes. In that same year, to help the counties deal with the drastic drop in local tax revenue, the Legislature assumed the counties' share of Medi-Cal costs. (Stats. 1978, ch. 292, § 33, p. 610.) In 1979, the Legislature relieved the counties of their obligation to share in Medi-Cal costs. (Stats. 1979, ch. 282, § 106, p. 1059.)

Also in 1979, the voters added to the state Constitution article XIII B, which placed spending limits on state and local governments and added the mandate/reimbursement provisions at issue here.

In 1982, the Legislature removed from Medi-Cal eligibility the category of "medically indigent persons" that had been added in 1971. The Legislature also transferred funds for indigent health care services from the state to the counties through the Medically Indigent Services Account. (Stats. 1982, ch. 328, §§ 6, 8.3, 8.5, pp. 1574-1576; Stats. 1982, ch. 1594, §§ 19, 86, pp. 6315, 6357.) Medically Indigent Services Account funds were then combined with county health service funds to provide health care to persons not eligible for Medi-Cal (Stats. 1982, ch. 1594, § 86, p. 6357), and counties were to provide health services to persons in this category "to the extent that state funds are provided" (*id.*, § 70, p. 6346).

From 1983 through June 1989, the state fully funded San Diego County's program for furnishing medical care to the poor. Thereafter, in fiscal years 1989-1990 and 1990-1991, the state partially funded San Diego County's program. In early 1991, however, the state refused to provide San Diego County full funding for the 1990-1991 fiscal year, prompting a threat by the county to terminate its indigent medical care program. This in turn led the Legal Aid Society of San Diego to file an action against the County of San Diego, asserting that Welfare and Institutions Code section 17000 imposed a legal obligation on the county to provide medical care to the poor. The county cross-complained against the state. The county argued that the state's 1982 removal of the category of "medically indigent persons" from Medi-Cal eligibility mandated a "new program or higher level of service" within the meaning of section 6 of article XIII B of the California Constitution, because it transferred the cost of caring for these persons to the county. Accordingly, the county contended, section 6 required the state to reimburse the county for its cost of providing such care, and prohibited the state from terminating reimbursement as it did in 1991. The county eventually reached a settlement with the Legal Aid Society of San Diego, leading to a dismissal of the latter's complaint.

While the County of San Diego's case against the state was pending, litigation was proceeding in a similar action against the state by the County of Los Angeles and the County of San Bernardino. In that action, the Superior Court for the County of Los Angeles entered a judgment in favor of Los Angeles and San Bernardino Counties. The state sought review in the Second District Court of Appeal in Los Angeles. In December 1992, the parties to the Los Angeles case entered into a settlement agreement providing for dismissal of the appeal and vacating of the superior court judgment.

The Court of Appeal thereafter ordered that the superior court judgment be vacated and that the appeal be dismissed.

The County of San Diego's action against the state, however, was not settled. It proceeded on the county's claim against the state for reimbursement of the county's expenditures for medical care to the indigent.[1] The majority holds that the county is entitled to such reimbursement. I disagree.

## II

Article XIII B, section 6 of the California Constitution provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, *except that the Legislature may, but need not, provide such subvention of funds for the following mandates:* [¶] . . . [¶] *(c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975.*" (Italics added.)[2]

Of importance here is Welfare and Institutions Code section 17000 (hereafter sometimes section 17000). It imposes a legal obligation on the counties to provide, among other things, medical services to the poor. (*Board of Supervisors* v. *Superior Court, supra,* 207 Cal.App.3d at p. 557; *County of San Diego* v. *Viloria* (1969) 276 Cal.App.2d 350, 352 [80 Cal.Rptr. 869].) Section 17000 was enacted long before, and has existed continuously since, January 1, 1975, the date set forth in subdivision (c) of section 6 of article XIII B of the California Constitution. Thus, section 17000 falls within subdivision (c)'s language of "[l]egislative mandates enacted prior to January 1, 1975," rendering it exempt from the reimbursement provision of section 6.

Contrary to the majority's conclusion, the Legislature's 1982 legislation removing the category of "medically indigent persons" from Medi-Cal did not meet California Constitution, article XIII B, section 6's requirement of imposing on local government "a new program or higher level of service," and therefore did not entitle the counties to reimbursement from the state under section 6 of article XIII B. The counties' legal obligation to provide medical care arises from section 17000, not from the subsequently enacted

---

[1] I agree with the majority that the superior court had jurisdiction to decide this case. (Maj. opn., *ante,* at pp. 85-90.)

[2] Section 6 of article XIII B pertains to two types of mandates: new programs and higher levels of service. The words "such subvention" in the first paragraph of this constitutional provision makes the subdivision (c) exemption applicable to both types of mandates.

1982 legislation. The majority itself concedes that the 1982 legislation merely "trigger[ed] the counties' responsibility to provide medical care as providers of last resort under section 17000." (Maj. opn., *ante,* at p. 98.) Although certain actions by the state and the federal government during the 1970's and 1980's may have alleviated the counties' financial burden of providing medical care for the indigent, those actions did not supplant or remove the counties' existing legal obligation under section 17000 to furnish such care. (*Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401, 411 [261 Cal.Rptr. 706]; *Madera Community Hospital* v. *County of Madera* (1984) 155 Cal.App.3d 136, 151 [201 Cal.Rptr. 768].)

The state's reimbursement obligation under section 6 of article XIII B of the California Constitution arises only if, after January 1, 1975, the date mentioned in subdivision (c) of section 6, the state imposes on the counties "a new program or higher level of service." That did not occur here. As I pointed out above, the counties' legal obligation to provide for the poor arises from section 17000, enacted long before the January 1, 1975, cutoff date set forth in subdivision (c) of section 6. That statutory obligation remained in effect when, during a certain period after 1975, the state assumed the financial burden of providing medical care to the poor, in an effort to help the counties deal with a drastic drop in local revenue as a result of the voters' passage of Proposition 13, which severely limited property taxes. Because the counties' statutory obligation to provide health care to the poor was created before 1975 and has existed unchanged since that time, the state's 1982 termination of Medi-Cal eligibility for "medically indigent persons" did not create a "new program or higher level of service" within the meaning of section 6 of article XIII B, and therefore did not obligate the state to reimburse the counties for their expenditures in health care for the poor.

### III

In imposing on the state a legal obligation to reimburse the counties for their cost of furnishing medical services to the poor, the majority's holding appears to bail out financially strapped counties. Not so.

Today's decision will immediately result in a reduction of state funds available to the counties. Here is why. In 1991, the Legislature added section 11001.5 to the Revenue and Taxation Code, providing that 24.33 percent of the moneys collected by the Department of Motor Vehicles as motor vehicle license fees must be deposited in the State Treasury to the credit of the Local Revenue Fund. In anticipation of today's decision, the Legislature stated in subdivision (d) of this statute: "This section shall cease to be operative on

the first day of the month following the month in which the Department of Motor Vehicles is notified by the Department of Finance of a final judicial determination by the California Supreme Court or any California court of appeal [that]: [¶] . . . [¶] (2) The state is obligated to reimburse counties for costs of providing medical services to medically indigent adults pursuant to Chapters 328 and 1594 of the Statutes of 1982." (Rev. & Tax. Code, § 11001.5, subd. (d); see also *id.*, § 10753.8, subd. (b).)

The loss of such revenue, which the Attorney General estimates at "hundreds of millions of dollars," may put the counties in a serious financial bind. Indeed, realization of the scope of this revenue loss appears to explain why the County of Los Angeles, after a superior court victory in its action seeking state reimbursement for the cost of furnishing medical care to "medically indigent persons," entered into a settlement with the state under which the superior court judgment was effectively obliterated by a stipulated reversal. (See *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119].) In a letter addressed to the Second District Court of Appeal, sent while the County of Los Angeles was engaged in settlement negotiations with the state, the county's attorney referred to the legislation mentioned above in these terms: "This legislation was quite clearly written with this case in mind. Consequently, to pursue this matter, *the County of Los Angeles risks losing a funding source it must have to maintain its health services programs at current levels.* The additional funding that might flow to the County from a final judgment in its favor in this matter, is several years away *and is most likely of a lesser amount than this County's share of the vehicle license fees.*" (Italics added.) Thus, the County of Los Angeles had apparently determined that a legal victory entitling it to reimbursement from the state for the cost of providing medical care to the category of "medically indigent persons" would not in fact serve its economic interests.

I have an additional concern. According to the majority, whenever there is a change in a state program that has the effect of increasing a county's financial burden under section 17000 there must be reimbursement by the state. This means that so long as section 17000 continues to exist, an increase in state funding to a particular county for the care of the poor, once undertaken, may be irreversible, thus locking the state into perpetual financial assistance to that county for health care to the needy. This would, understandably, be a major disincentive for the Legislature to ever increase the state's funding of a county's medical care for the poor.

The rigidity imposed by today's holding will have unfortunate consequences should the state's limited financial resources prove insufficient to

reimburse the counties under section 6 of article XIII B of the California Constitution for the "new program or higher level of service" of providing medical care to the poor under section 17000. In that event, the state may be required to modify this "new program or higher level of service" in order to reconcile the state's reimbursement obligation with its finite resources and its other financial commitments. Such modifications are likely to take the form of limitations on eligibility for medical care or on the amount or kinds of medical care that the counties must provide to the poor under section 17000. A more flexible system—one that actively encouraged shared state and county responsibility for indigent medical care, using a variety of innovative funding mechanisms—would be less likely to result in a curtailment of medical services to the poor.

And if the Legislature is unable or unwilling to appropriate funds to comply with the majority's reimbursement order, the law allows the county to file "in the Superior Court of the County of Sacramento an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement." (Gov. Code, § 17612, subd. (c); see maj. opn., *ante,* at p. 82.) Such a declaration would do nothing to alleviate the plight of the poor.

CONCLUSION

The dispute in this case ultimately arises from a collision between the taxing limitations on the counties imposed by article XIII A of the state Constitution and the preexisting, open-ended mandate imposed on them under Welfare and Institutions Code section 17000 to provide medical care for the poor. As I have explained, the Legislature's assumption thereafter of some of the resulting financial burden to the counties did not repeal section 17000's mandate, nor did the Legislature's later termination of its financial support create a new mandate. In holding to the contrary, the majority imposes on the Legislature an obligation that the Legislature does not have under the law.

I recognize that my resolution of this issue—that under existing law the state has *no legal obligation* to reimburse the counties for health expenditures for the poor—would leave the counties in the same difficult position in which they find themselves now: providing funding for indigent medical care while maintaining other essential public services in a time of fiscal austerity. But complex policy questions such as the structuring and funding of indigent medical care are best left to the counties, the Legislature, and ultimately the electorate, rather than to the courts. It is the counties that must figure out how to allocate the limited budgets imposed on them by the electorate's adoption of articles XIII A and XIII B of the California Constitution among indigent medical care programs and a host of other pressing

and essential needs. It is the Legislature that must decide whether to furnish financial assistance to the counties so they can meet their section 17000 obligations to provide for the poor, and whether to continue to impose the obligations of section 17000 on the counties. It is the electorate that must decide whether, given the ever-increasing costs of meeting the needs of indigents under section 17000, counties should be afforded some relief from the taxing and spending limits of articles XIII A and XIII B, both enacted by voters' initiative. These are hard choices, but for the reasons just given they are better made by the representative branches of government and the electorate than by the courts.